Chief Judge Breitel.
Plaintiff executor, in a wrongful, death action, recovered a jury verdict for $200,000. The Appellate Division set aside the verdict and judgment in favor of plaintiff executor and dismissed the complaint. In doing so, that court noted that even if it were not to dismiss the complaint, it would *427 set the verdict aside as contrary to the weight of the credible evidence. Plaintiff executor appeals.
Decedent, Dr. Lewis, committed suicide some seven months after an automobile accident from which he had walked away believing he was uninjured. In fact he had suffered head injuries with consequences to be detailed later. The theory of the case was that defendants, owner and operator of the vehicle which struck decedent’s automobile, were responsible in tort for the suicide as a matter of proximate cause and effect. The issue is whether plaintiff’s evidence of cause of the suicide was sufficient to withstand dismissal of the complaint.
There should be a reversal of the order of the Appellate Division and a new trial ordered. Regardless of how the evidence might be viewed by those entitled to weigh it for its probative effect, there was enough to establish plaintiff’s right to have his evidence assessed by a trial jury, and it was unwarranted to dismiss the complaint. In so concluding, it is emphasized that reasonable men might, would, and do differ on how the jury as fact-finders, should have resolved the issue of fact. Indeed, the Appellate Division made it clear that, in any event, it viewed the verdict in favor of plaintiff as against the weight of the credible evidence. On dismissal of the complaint, however; the question is purely one of law and that is another matter (see, e.g., Sagorsky v. Malyon, 307 N. Y. 584, 586).
Prefatorily, the court is unanimously of the view; as was the Appellate Division, that negligent tort-feasors may be liable for the wrongful death, by suicide, of a person injured by their negligence. Issues arise only on the sufficiency of the evidence to permit a jury to conclude as did the jury in this case.
On December 2, 1966, decedent Dr. Lewis, a 43-y.ear-old surgeon, was involved in an intersection collision. Upon impact, the left side of his head struck the frame and window of his automobile. Suffering no evident injuries, he declined aid and drove himself home. Early the next day he experienced an episode of vomiting. An examination later that day at his hospital was inconclusive.
Two days after the accident, Dr. Lewis- had a seizure followed by others: After a four- or five-day stay in the hospital as a *428 patient he was diagnosed as having had a subdural contusion and cerebral concussion. Medication was prescribed.
He sustained recurring seizures, was hospitalized again, was further tested, and after five days, was discharged with diagnosis of “ post traumatic focal seizures Then ensued a period of deterioration and gradual contraction of his professional and private activities. Meanwhile, his wife, partially paralyzed as a result of an old poliomyelitis, suffered “ nervous exhaustion ” and his mother became ill with cancer.
On July 7, 1967, the day he learned of his mother’s illness, decedent executed his will. On July 9, after experiencing three seizures that day, he went to the bathroom of his home, closed the door and shot himself in the head. He died the following day. Just before the gunshot, his wife heard him say to himself, “ I must do it, I must do it ”, or words to that effect.
Two suicide notes, ¡both dated July 9, 1967, were found next to the body. One, addressed to his wife, professed his love. The other, addressed to the family, contained information about a bank account and the location of his will and requested discreet disposition of certain personal property. He warned that the note ‘ ‘ must never be seen by anyone except the three of you as it would alter the outcome of the ‘ case ’ — i.e., it’s worth a million dollars to you all.” And he went on to say that “ I am perfectly sane in mind ’ ’ and ‘ ‘ I know exactly what I am doing ’ ’. Alluding to the accident, the loss of his office and practice, his mother’s and his wife’s illnesses, the imposition caused thereby to his children, and his mounting responsibilities, he professed inability to continue.
Precedent of long standing establishes that public policy permits negligent tort-feasors to be held liable for the suicide of persons who, as the result of their negligence, suffer mental disturbance destroying the will to survive (e.g., Koch v. Fox, 71 App. Div. 288, 298-299; Liability for Suicide, Ann., 11 ALR 2d 751, esp. 758-762; cf. Gioia v. State of New York, 16 A D 2d 354, 357-359 [Halpern, J.]; McMahon v. City of New York, 16 Misc 2d 143, 144 [Christ, J.]; Cauverien v. De Metz, 20 Misc 2d 144, 148 [Nathan, J.]). In workmen’s compensation law, where, to be sure, proximate cause is considerably less circumscribed than the standard in negligence law, courts have generally sustained awards ¡based upon; findings that an insured’s suicide resulted *429 from mental illness caused by a work-related injury (see, e.g., Matter of Reinstein v. Mendola, 33 N Y 2d 589; Matter of Franzoni v. Loew’s Theatre & Realty Corp., 20 N Y 2d 889; see, also, 1A Larson, Workmen’s Compensation Law, § 36; Workmen’s Compensation — Suicide, Ann., 15 ALR 3d 616).
So, too, in criminal law, where proof of cause must meet a more rigorous standard than in negligence law, defendants have been held responsible for the suicides of their victims (see, e.g., Stephenson v. State, 205 Ind. 141, 188-189; see, also, State v. Angelina, 73 W. Va. 146, 150-151; as to intentional torts, see Prosser, Torts [4th ed.], pp. 30, 263).
Hence, the act of suicide, as a matter of law, is not a superseding cause in negligence law precluding liability. An initial tort-feasor may be liable for the wrongful acts of a third party if foreseeable (see Restatement, 2d, Torts, § 442A). Thus a tort-feasor may be liable for the ensuing malpractice of a physician treating the victim for the tortiously caused injuries (see, e.g., Milks v. McIver, 264 N. Y. 267, 269). No different rule applies when death results from an “ involuntary ” suicidal act of the victim as a direct consequence of the wrongful conduct.
That suicide may be encouraged by allowing recovery for suicide, a highly doubtful proposition in occidental society, is unpersuasive to preclude recovery for the suicide of a mentally deranged person. The remote possibility of fraudulent claims connecting a suicide with mental derangement affords no basis for barring recovery (cf. Tobin v. Grossman, 24 N Y 2d 609, 615; Gelbman v. Gelbman, 23 N Y 2d 434, 439; Battalla v. State of New York, 10 N Y 2d 237, 242). The obvious difficulty in proving or disproving causal relation should not bar recovery (cf. Schechter v. Klanfer, 28 N Y 2d 228, 231-233).
Thus, there is neither public policy nor precedent barring recovery for suicide of a tortiously injured person driven “ insane ” by the consequence of the tortious act (see Restatement, 2d, Torts, § 455; Prosser, Torts [4th ed.], op. cit., pp. 280-281; see, generally, Schwartz, Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry, 24 Vand. L. Rev. 217, 255). Indeed, recovery for negligence leading to the victim’s death by suicide should perhaps, in some circumstances, be had even absent proof of a specific mental disease or even an irresistible impulse provided there is significant causal con *430 nection (compare Schwartz, op. cit., at pp. 234 — 236, with Restatement, 2d, Torts, § 455; Prosser, op. cit., at p. 281, n. 79, authorities collected).
In any event, this case was tried for all purposes in accordance with the prevailing law. Indeed, the jury was instructed, primarily, upon the theory of liability for a suicide by an accident victim suffering from ensuing mental disease, who was unable to control the “ irresistible impulse ” to destroy himself. The theory of the trial, therefore, determines the rule to be applied on the appeal.
Dr. Lewis was physically and mentally healthy immediately prior to the automobile accident in which he struck his head against the interior of his own vehicle. After the accident he suffered several epileptic seizures, often with unconsciousness. Before the accident he had never suffered a seizure. For seven months between the accident and his death, Dr. Lewis experienced no fewer than 38 separate seizures. The neurologist who treated him testified that as the result of the blow on the head he sustained a cerebral contusion which caused seizures and underlying hemorrhaging in the brain covering, destroying part of the brain. According to the neurologist, brain hemorrhage causes scarring which distorts impulses, producing further seizures, further scarring, cell atrophy, and wasting, in a deadly cycle. On the day of his death Dr. Lewis had three seizures.
The truncated description of the testimony demonstrates, and it is not seriously disputed, that there was sufficient evidence from which a reasonable person might conclude that the accident caused traumatic organic brain damage.
The only authentic issue is whether the suicide was an “irresistible impulse” caused by traumatic organic brain damage. The issue is limited on this appeal because of the theory of the case based on the traditional but not entirely satisfactory concept of the “ irresistible impulse ”. Medical and legal lore have developed an incisive critique of that concept but its evolution or clarification must await another day and another case. It has been cogently argued that it ought to be sufficient to accept mentál illness, traumatic in origin, as a substantial cause of particular behavior, including suicide (Schwartz, op. cit., at pp. 234-236).
*431 The brain, damage .and the seizures compelled Dr. Lewis to give up his surgical practice and many other activities. The seizures were acceleratedly and progressively severe and uncontrolled by drugs. The treating neurologist testified that the brain cells in the area where he struck his head are concerned with the emotions and motor activity. After the accident, in addition to the accelerated severe seizures, decedent showed symptoms never before observed. He was constantly depressed, unsteady on his feet, irritable, complained of headaches, and walked askew.
On the day of the suicide, only seven months after the accident, when Dr. Lewis had had three seizures, his daughter tried to speak with him but he did not respond. After the third seizure he seemed unable to recognize his wife, had a strange look, and locked himself in the bathroom. Twenty minutes later, his wife heard him mutter, “ I must do it, I must do it ”, and then a gun-, shot rang out. Dr. Lewis had shot himself in the head and died the f ollowing day.
The treating neurologist testified as an expert that after the three seizures decedent was disoriented, lacked awareness, was irrational, and in postconvulsive psychosis which placed his conduct beyond his control.
This is the testimony most favorable to plaintiff, and it is upon these facts and the inferences drawn from them that the jury found that the accident was the proximate cause of Dr. Lewis taking his own life.
It is contended that the testimony of the treating neurologist was incredible as a matter of law. That the neurologist did not practice the closely related specialty of psychiatry was no bar to his testifying as a medical expert (see People v. Rice, 159 N. Y. 400, 410; Richardson, Evidence [10th ed.], § 368). His failure before the suicide to diagnose Dr. Lewis as mentally ill affects the weight but not the admissibility of his testimony. Of course, the issue was Dr. Lewis’ sanity at the time of the suicide. The expert’s opinion was based on the symptoms shown before the suicide, the three seizures on the day of the suicide, Dr. Lewis ’ confused state after the last of the seizures, and his muttering. Upon such facts it is logically, medically, and legally impermissible to reject his opinion as incredible as *432 a matter of law (cf. Matter of Palermo v. Gallucci & Sons, 5 N Y 2d 529, 532).
There was, of course, other evidence in the case to support a jury verdict on the issue of fact whether the suicide was a rational or irrational act.
There were the suicide notes. One, it will be recalled, was a note to his wife requesting forgiveness and professing love. In the other Dr. Lewis meticulously directed destruction of certain personal material. In this second note Dr. Lewis stated that he knew what he was doing; that he was perfectly sane; that he hoped his other note to his wife would not affect the “ case ”; and that the second note should be destroyed so not to jeopardize the “ outcome of the case ” which was “ worth a million dollars ”.
That Dr. Lewis believed himself sane should, of course, not control. Most insane people are certain of their sanity. Sanity is never established by a self-serving certification. He was not mentally retarded and his belief that his death might secure a large amount of money is hardly surprising.
In tort law, as contrasted with criminal law, there is recognition that one may retain the power to intend, to know, and yet to have an irresistible impulse to act and therefore be incapable of voluntary conduct. This court has recently recognized in the context of contract law that out-dated cognitive tests of mental soundness do not accord with modern knowledge or experience (see Ortelere v. Teachers’ Retirement Bd., 25 N Y 2d 196, 203-205, involving a letter that a lawyer might envy for its acuteness). The issue in this case was, precisely, whether Dr. Lewis, who obviously knew what he was doing and intended to do what he did, nevertheless, was, because of mental derangement, incapable of resisting the impulse to destroy himself. Precedents and modern knowledge say that that could have been. The jury found that it was so.
Ho doubt Dr. Lewis at some conscious level desired to take his life. This is demonstrated by the acquisition of the gun, his changing his will two days before his death, and the suicide notes. A suicide note, moreover, does not preclude, as a "matter of law, a finding that the writer was unable to control his suicidal act (cf. Matter of Franzoni v. Loew’s Theatre & Realty Corp., 20 N Y 2d 889, 890, supra; Terminal Shipping Co. v. *433 Traynor, 243 F. Supp. 915, 917). An irresistible impulse does not necessarily mean a “ sudden ” impulse (see La Fave & Scott, Criminal Law, pp. 284-285). The evidence supports a finding that the insane “ irresistible impulse ” that cajised decedent to take his life also impelled the acquisition, of the gun and the writing of the suicide notes.
True, defendant offered conflicting testimony of a psychiatrist, retained just before he testified, who had never examined Dr. Lewis. But this presented the jury merely with testimony to weigh against plaintiff’s proof (cf. Matter of Franzoni v. Loew’s Theatre & Realty Corp., 20 N Y 2d 889, 890, supra; Matter of Palermo v. Gallucci & Sons, 5 N Y 2d 529, 532, supra). That defendants failed to call as a-witness their own psychiatrist who had examined Dr. Lewis after the accident in the personal injury action and before his death was a matter also left to the jury’s evaluation and adverse inference. Defendants never explained the failure to produce their psychiatrist on the trial (see Noce v. Kaufman, 2 N Y 2d 347, 353).
Dr. Lewis’ wife was paralyzed in the upper part of her body due to poliomyelitis and was suffering nervous exhaustion when he committed suicide. His mother had recently been diagnosed for cancer. It was for the jury to consider whether these dire facts, along with the other evidence, rendered remote or displaced his mental derangement as a substantial cause of the suicide. Put another way, the issue for the jury was whether the defendants’ negligence substantially contributed to Dr. Lewis’ death (Dunham v. Village of Canisteo, 303 N. Y. 498, 505). They did not have to find that it was the only cause. Indeed, authorities in other disciplines have concluded, and it is rather obvious, that there never can be a sole cause for suicide (see Rice, Organic Brain Syndromes & Suicide, 2 Lit. J. Psychoanalytic Psychotherapy, 338, 346-355; K Menninger, Foreword, Clues to Suicide, vii [Schneidman & Farberow eds.]). In finding that the brain damage was the proximate cause of the suicide, the jury reached a conclusion both legally and medically supportable (see Achté, Lonnqvist & Hillbon, Suicide Following War Brain Injuries, Acta Psychiatrica Scandinavica 28 [Supp. 225]; Achté & Mattila, The Incidence of Suicide Among Men With War Brain Injuries in Finland, 1970 Helsinki *434 Psych. Clin. Yr. Bk. 229, 233, finding that suicide was the immediate consequence of traumatic epilepsy).
Of course, there may be and undoubtedly have been cases where the causal nexus becomes too tenuous to permit a jury to “ speculate ” as to the proximate cause of the suicide. And the tenuous link is not strengthened or made more real by however strong a verbalization of cause (see Corrieri v. Cole, 26 N Y 2d 932).
A suicide is a strange act and no rationalistic approach can fit the act into neat categories of rationality or irrationality. When the suicide is preceded by a history of trauma, brain damage, epileptic seizures, aberrational conduct, depression and despair, it is at the very least a fair issue of fact whether the suicide was the rational act of a sound mind or the irrational act or irresistible impulse of a deranged mind evidenced by a physically damaged brain. It would be illogical to conclude otherwise. Consequently, although the Appellate Division in exercise of its supervisory power to review the facts could set the jury verdict aside, it was impermissible for it to dismiss the complaint.
Since the Appellate Division, in reversing, stated that in any event it would have set the verdict aside as contrary to the weight of the evidence, the verdict in favor of plaintiff may not be reinstated and a new trial is required.
Accordingly, the order of the Appellate Division should be reversed, with costs, and a new trial directed.
Judges Jasen, GUbbielli, Jones, Wachtleb, Rabin and Stevens concur.
Order reversed, etc.