OPINION OF THE COURT
 

 Meyer, J.
 

 The question presented by this appeal is whether the State is liable for the death of one and blindness of another certified heroin addict, residents of the Iroquois Narcotic Rehabilitation Center maintained by the State Narcotic Addiction Control Commission, both of whom had been committed to the center pursuant to the provisions of the Mental Hygiene Law. The death in one case and blindness in the other resulted from the drinking of a fluid (Ditto) containing methyl alcohol which had been mixed with an orange preparation called Tang. After a joint but bifurcated trial, the Court of Claims found for each claimant on both negligence and contributory
 
 negligence
 
 and directed a further trial on the issue of damages. From that interlocutory judgment the State appealed to the Appellate Division, Third Department, which
 
 *371
 
 agreed, one Judge dissenting, with the Court of Claims’ finding of negligence, and rejected the State’s argument that it is immune from liability because its addict rehabilitation program involves the exercise of governmental judgment and discretion (cf.
 
 Weiss v Fote,
 
 7 NY2d 579), but concluded that the complaints should nevertheless be dismissed because the weight of the credible evidence established that each addict had sufficient control of his will to resist the temptation of ingesting the Ditto fluid (59 AD2d 480). On claimants’ appeal of right to us, the order of the Appellate Division should be reversed and that of the Court of Claims reinstated.
 

 We agree with the Appellate Division’s legal conclusion that the negligence issue turns not on the design of the rehabilitation program, but on the manner in which it was carried out. With respect to its affirmance of the finding of fact that there was negligence on the part of the State, we note that, since there is ample evidence in the record to support that finding,
 
 *
 
 the issue is beyond our power of review. Our disagreement with the Appellate Division is on the issue of contributory negligence, on which we find the standard used by that court incorrect and the weight of the evidence to be with the findings of the Trial Judge (cf.
 
 Matter of Town Bd. of Town of Clarkstown v Sterngass,
 
 40 NY2d 888; Cohen and Karger, Powers of the New York Court of Appeals, § 112).
 

 Since the Padula action is for wrongful death, it was the State’s burden to establish contributory negligence as a defense (EPTL 5-4.2), but we do not distinguish the two cases on that ground for in our view the weight of the evidence sustains the Trial Judge’s finding that as addicts they did not have the ability to resist the temptation to ingest the Ditto-Tang mixture. The Appellate Division’s contrary conclusion is predicated on its conception that neither addict suffered from a mental disability, that both had been found psychologically sound prior to admission and were not seeing a psychiatrist and that their actions were reasoned and deliberate. That reasoning fails to take account of our decisions in
 
 Fuller v
 
 
 *372
 

 Preis
 
 (35 NY2d 425) and
 
 Ortelere v Teachers’ Retirement Bd. of City of N. Y.
 
 (25 NY2d 196). In
 
 Fuller
 
 we recognized in a tort setting "that one may retain the power to intend, to know, and yet to have an irresistible impulse to act and therefore be incapable of voluntary conduct” (35 NY2d, at p 432); in
 
 Ortelere
 
 with respect to capacity to contract we held that incapacity "may exist, because of volitional and affective impediments or disruptions in the personality, despite the intellectual or cognitive ability to understand” (25 NY2d, at p 199). Moreover, the Appellate Division placed undue emphasis on the label "mental disability”, which as we noted in
 
 Matter of Torsney
 
 (47 NY2d 667, 683), is being continually redefined by psychiatrists. The divergence of viewpoint between the law as applied in the decision under appeal and at least one practicing psychiatrist is well illustrated by a quotation from an article by Dr. Daniel D. Pugh, entitled The Insanity Defense in Operation: A Practicing Psychiatrist Views Durham and Brawner (1973 Wash U LQ 87). Commenting on the difficulty with the law’s definition of "mental disease” as stated in
 
 Durham v United States
 
 (214 F2d 862) and
 
 McDonald v United States
 
 (312 F2d 847), Dr. Pugh, whose view is that heroin addiction clearly is a mental illness (1973 Wash U LQ, at p 107), has this to say
 
 (id.,
 
 at pp 104-105): "Is heroin addiction a 'mental disease’ under
 
 Durham-McDonald?
 
 I must confess I cannot think of a psychiatric illness that better fits the
 
 Durham-McDonald
 
 definition of insanity. It is the only psychiatric disease that has as one of its typical manifestations an irresistible compulsion to commit crimes. It is the only psychiatric disease in which the impairment of behavior control can be measured: less than five percent of addicts who have been withdrawn and returned to the community are able to avoid readdiction within a year. Voluntary withdrawal from heroin by persons with access to the drug is virtually unknown. Although the disease has little effect on cognitive processes, there is no psychiatric disease that has a greater effect on emotional processes.”
 

 We noted in
 
 Fuller v Preis (supra,
 
 at pp 429-430) that: "recovery for negligence leading to the victim’s death by suicide should perhaps, in some circumstances, be had
 
 even absent proof of a specific mental disease
 
 or even an irresistible impulse provided there is significant causal connection [citations omitted].” (Emphasis supplied.) Whatever the definition of mental illness for purposes of CPL 330.20, and whatever the
 
 *373
 
 contributory or comparative negligence rule may ultimately be held to be as to a person under the influence of drugs in a noncustodial situation (compare NY PJI 2:45 [Contributory Negligence — Persons Under Disability — Intoxicated Person], with NY PJI 2:46 [Contributory Negligence — Persons Under Disability — Mental Deficiency]), as to which we express no opinion, we think that in relation to persons in the custody of the State for treatment of a drug problem, contributory (or comparative) negligence should turn not on whether the drug problem or its effects be categorized as a mental disease nor on whether the injured person understood what he was doing, but on whether based upon the entire testimony presented (including objective behavioral evidence, claimant’s subjective testimony and the opinions of experts) the trier of fact concludes that the injured person was able to control his actions. As Mr. Justice Simons put it in
 
 Mochen v State of New York
 
 (43 AD2d 484, 487, on second app 57 AD2d 719) in holding it a question for the jury whether an inmate of a mental institution was guilty of contributory negligence in jumping out a window: "The disability may fall short of psychosis or severe retardation and the act may be a voluntary judgment by the patient but still be the product of impulse or irrational behavior beyond his control. Under such circumstances, a plaintiff should not be held to any greater degree of care for his own safety than that which he is capable of exercising” (see, also,
 
 Gioia v State of New York,
 
 22 AD2d 181; Contributory Negligence of Mentally Incompetent or Mentally or Emotionally Disturbed Person, Ann., 91 ALR2d 392).
 

 Tested by that standard, the weight of the evidence in the instant case favors the finding of the Trial Judge that Padula and Modafferi were not guilty of contributory negligence. The evidence shows that the accepted practice in institutions such as that in which they resided was to keep close watch on chemicals such as methyl alcohol because addicts were constantly looking for something to get high on, that at the Iroquois Center alcohol and drugs were not permitted, urine tests were taken at random to see whether residents had ingested any chemical, spot inspections of lockers for chemicals were carried out, and chemicals used in the shops were closely controlled. Thus, the fact that Padula and Modafferi had been screened and accepted for the program cannot be read as meaning that the institution believed them
 
 *374
 
 wholly free of the effects of the addiction which brought them to the institution in the first place.
 

 The expert testimony on behalf of claimants came from Doctors Herbert Wender and Daniel Casriel. Dr. Wender testified that it was common medical knowledge at the time of the incident that drug abusers motivated by the desire for the gratification induced by a high would deny the reality of the damage that methyl alcohol could do and drink it, even if told it was poisonous and could cause death or blindness. Dr. Casriel’s opinion was that it was common knowledge at the time that a drug addict is an emotional infant who will insert any available chemical into any bodily orifice by any means available in order to obtain an affective change, for which reason any chemical that could possibly be taken to change mood, whether poison or not, had to be kept locked away, that the institution had to protect the addict against his own proclivity for danger, and that a certified addict, unless his personality is totally restructured, has a lifelong psychological dependence on drugs, as a result of which if he cannot get heroin he will take other substitutes. Both also testified in response to hypothetical questions that Padula and Modafferi could be expected to ingest the Ditto-Tang drink.
 

 Testifying on behalf of the State, Dr. Jerome H. Jaffe stated that there was no consensus among medical experts, that the majority view was that heroin addicts are not emotional infants and will make choices between good and bad substances. He conceded, however, that as to persons in a facility such as Iroquois "much of the expert opinion, and, incidentally, backed by practical and actual experience of and with heroin addicts is that such addicts do not have the ability to resist temptation to ingest a substance that might make them euphoric or 'high’, even if such substance is harmful or dangerous to the human body if ingested”, though he gave it as his personal opinion that such an addict had discretion to say "no”.
 

 The testimony of those present at the print shop drinking session was that Joseph Perrone read from the Ditto can, on which there was a skull and crossbones, a warning that it was poisonous and could cause blindness or death, and Modafferi testified that Perrone said "We’ve got to be crazy to drink this”, but that both he and Perrone drank it nevertheless, that he was aware when he drank it that it could cause
 
 *375
 
 blindness or death but could not resist doing so because he felt he needed it and wanted to believe it was all right to do so.
 

 Weighing on the side of the finding by the Court of Claims are the procedures imposed by the institution in question and such institutions generally, the clearly stated opinions of Doctors Wender and Casriel, and the fact that not only Padula and Modafferi but six other residents drank the Ditto-Tang concoction notwithstanding that the warning on the can had been read to them. Weighing against. the Court of Claims finding is the self-interest of Modafferi and the opinion expressed by Dr. Jaffe. Bearing in mind the opportunity of the Trial Judge to see and hear Modafferi and thus use his demeanor in evaluating his evidence and Dr. Jaffe’s concession that there was a substantial body of expert opinion contrary to the opinion he expressed, we conclude that the weight of the evidence is with the findings of the Court of Claims rather than those of the Appellate Division.
 

 Accordingly, the order of the Appellate Division should be reversed and the judgments of the Court of Claims should be reinstated, with costs.
 

 Judges Gabrielli, Jones, Wachtler and Fuchsberg concur with Judge Meyer; Chief Judge Cooke and Judge Jasen dissent and vote to affirm for the reasons stated in the opinion by Mr. Justice Michael E. Sweeney at the Appellate Division (59 AD2d 480).
 

 Order reversed, etc.
 

 *
 

 In the guard’s admission of an inmate to the locked print shop after hours; in the availability of the Ditto fluid which was supposed to be locked away at the close of day; in the guard’s failure to intercede when he discovered not just the inmate he had permitted to enter the print shop but a number of others, some in giddy condition, with drinks in front of them, and was offered a drink by one of them; in the guard’s false entry that the print shop had been broken into; and in the State’s failure to call the guard as a witness or explain his absence.