Carol L. SZIMONISZ, Personal Representative of the Estate of George P. Szimonisz, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 79–1543–RE.

United States District Court, D. Oregon.

March 17, 1982.

Charles Paulson, Portland, Or., for plaintiff.

William B. Borgeson, Asst. U. S. Atty., Portland, Or., for defendant.

## OPINION

REDDEN, Judge:

This action for wrongful death under the Federal Tort Claims Act was brought by Carol Szimonisz against the United States Government for the failure of the Veteran's Administration to diagnose and treat her husband's operable brain tumor, leading to his death by suicide. The case was tried to the court.

George Szimonisz committed suicide on September 16, 1976. An autopsy was performed which revealed a parasagittal meningioma, a benign tumor of the covering of the brain, which was about the size of an egg. The tumor had not been diagnosed by the Veteran's Administration physicians despite the fact that such tumors grow slowly and George Szimonisz had been hospitalized and treated in the Veteran's Administration Hospital on numerous occasions over a period of four years. Such a tumor is readily detectable by means of either Computerized Axial Tomography (CAT scan) or the more widely available isotope brain scan.

In deciding this case I must first decide whether George Szimonisz's death by suicide is legally compensable. I must then determine whether that suicide was proximately caused by the defendant's negligence. Finally, I must determine a reasonable amount of damages.

*Was Szimonisz's Death by Suicide Legally Compensable?*

Tort liability for the suicide of another is a relatively new cause of action, dating from the late 1950s. The landmark case of *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960), describes the reasons for its relatively late recognition which are consequences of late medieval and reformation theology which have proved to be less persuasive in modern times. *Tate*, however, is not in point here because it established liability for a suicide resulting from an intentional tort, *i.e.*, the intentional infliction of emotional distress. The present case bases the claim on negligence.

The reported cases in point are state court decisions from New York and Massachusetts, *Fuller v. Preis*, 35 N.Y.2d 425, 363 N.Y.S.2d 568, 322 N.E.2d 263 (1974), and *Freyermuth v. Lutfy*, 376 Mass. 612, 382 N.E.2d 1059 (1978). The *Fuller* case is a persuasive unanimous decision by the New York Court of Appeals which accepts, as almost axiomatic, the existence of a cause of action for negligence resulting in suicide. In *Fuller*, an automobile collision occurred, in which the plaintiff's decedent, a surgeon, suffered a concussion. As a result, he became subject to ever more frequent seizures which curtailed his professional and personal activities. The suicide occurred seven months after the accident. The Court of Appeals sustained a finding of liability against the defendant, despite conflicting medical evidence and the fact that there were other possible explanations for the suicide.

The issue of proximate cause was discussed at length by the *Fuller* court which indicated that the conventional proximate cause analysis should and would supercede the "irresistible impulse" test. The latter requires a causal link between the defendant's wrongful conduct and the plaintiff's state of insanity which, by irresistible impulse, leads to the suicide. *Fuller* did not, however, specifically abandon the latter for the former in its decision.

*Freyermuth v. Lutfy, supra*, a Massachusetts case, involved an automobile accident which allegedly led to the decedent's suicide. There, the defendant was held to be 60% liable for the accident itself on a comparative negligence basis. Decedent, who had a history of mental illness either cured or in remission at the time of the accident, killed herself a few months thereafter. The plaintiff's jury verdict was upheld by a court applying both the conventional proximate cause analysis and the irresistible impulse test. The court concluded that the suicide was a "spontaneous and unpremedi-

tated act" for which the defendant was liable.

■ I join these courts in holding that a suicide is not, *per se,* an independent intervening cause which will defeat liability in a negligence case. Where the causal link between the defendant's wrongful act and the suicide is clearly established by the evidence, liability may also be established. In my judgment, the standard proximate cause analysis is the appropriate analytical tool in these circumstances. However, it must be noted that in the present case the proximate cause and "irresistible impulse" tests lead to the same result, because I find that Szimonisz's mental illness would have prevented him from making a "rational" decision to end his own life. The federal courts which have faced the issue of tort actions for the causing of a suicide have recognized the special problems inherent in a finding of causation in this area of the law. *Jamison v. Storer Broadcasting,* 511 F.Supp. 1286, 1291–2 (D.C.E.D.Mich., 1981); *see also Wible v. Lumbermans Mut. Cas. Co.,* 523 F.Supp. 236, 238 (D.C.E.D.Penn., 1981). I agree with those cases in holding that the demonstration of causation must be clear, and that it must be certain that the deceased undertook his suicide as a result of mental illness which arose due to the defendant's acts or omissions.[1]

*Was the Suicide Caused by the Defendant's Negligence?*

■ The plaintiff's evidence established that Szimonisz was suffering from the effects of a relatively large, non-cancerous brain tumor at the time of his suicide. Such tumors of the brain covering are called meningiomas, they expand slowly and produce inexorable pressure on and displacement of the soft tissues of the brain. The testimony established that such meningiomas can be successfully removed through surgery. The risks of the procedure are not much greater than the usual hazards present in all surgery, and the vast majority of the patients recover without major complications or significant residual disability. The testimony also established that such tumors are highly vascular and are, therefore, readily apparent on an isotope brain scan or CAT scan.

The clinically-observable symptoms of such a tumor include, in addition to possible mental disturbances, a certain spasticity or uncertainty of gait attended by occasional loss of balance; a nystagmus or trembling of the eyeballs; headaches, lethargy and difficulties in spatial orientation. During his numerous visits to the V.A. hospitals as well as his four admissions, Szimonisz exhibited many of these symptoms. The hospital records revealed the presence of headache, nystagmus, lethargy and uncertainty of gait. These symptoms occurred at separate times and did not present, at any one time, the full symptomatology which would immediately suggest the need for diagnostic brain tests. Only upon review of the entire medical history would the need for such tests have been apparent. The medical testimony in this case was thus directed to the question of whether, under these circumstances, the failure to call for diagnostic brain tests constituted negligence.

On this issue there was conflicting expert testimony, but I find that the plaintiff proved, by a preponderance of the evidence, that the failure to call for such tests constituted negligence. The testimony of the plaintiff's experts was persuasive in this regard, and was far stronger than that presented by defendant. Even the defense expert, Dr. Olmscheid, agreed with the proposition that a psychiatrist should always be conscious of the possibility of tumor involvement. He felt, however, that the hospital's actions had not constituted negligence in this case. I agree with the expert medical testimony stating that the various treating physicians failed to measure up to the appropriate standard of care, that of the practitioner using reasonable skill and care, *Moulton v. Huckleberry,* 150

1. The use of this language does not indicate a change in the traditional burden of proof. The plaintiff in this case met her burden on the issue of causation by a preponderance of the evidence, and so prevails.

Or. 538, 546–547, 46 P.2d 589 (1935). Szimonisz's symptoms and medical records indicated the need for a relatively simple diagnostic test, which would have revealed the tumor and led to its removal.

■ Another difficult question is that of proximate cause. There was continued disagreement in the medical testimony as to whether or not the undiagnosed tumor caused, or materially contributed to the decedent's mental distress and ultimate suicide. This issue is a contested one in the medical literature, as well. There was defense testimony to the effect that a causal link between Szimonisz's tumor and the delusions and depression which overcame him would be unlikely, given the location of the tumor in the brain covering. However, the plaintiff's experts contradicted this view, and were of the opinion that the gradual displacement of the brain tissue near the tumor could be expected to result in behavioral and attitudinal changes of a severe nature. Again, the plaintiff's experts were the more convincing. The defense expert, Dr. Olmscheid, whose testimony on this issue was helpful and straightforward, appeared to believe that there was a possibility of such a causal link. The testimony which was most helpful to the court in this regard was that of the plaintiff's expert Dr. McCulloch, who indicated that, in his view, the tumor would have probably intensified the severity of a pre-existing paranoid depression:

So I am not saying the depression was totally caused by the tumor. I am suggesting strongly that it was aggravated and made worse by the presence of the tumor.

Tr. 16.

I find this testimony most persuasive on the issue, and hold that the existence of the undiagnosed tumor seriously aggravated a pre-existing mild paranoid state, and was the proximate cause of Szimonisz's suicide.

*Damages*

■ The plaintiff presented the testimony of an economist, Dr. Crick, on the damages issue. He estimated that lost wages for the decedent, discounted for present value and adjusted for inflation and income taxes, were between $583,555 and $984,360. However, Dr. Crick was subjected to effective cross-examination tending to establish that the assumptions underlying his projections were extremely liberal and were at variance with the weight of the evidence. It simply is not consistent, for instance, to take the plaintiff's *peak* earnings of $14,315.75, in 1973, and use this figure essentially as a base for projected earnings for 1981 in the range of $30,000. This is especially true when the income for the years preceding and following 1973 are consistent with each other. The plaintiff's earnings in 1972 were $8,623; in 1973, $14,315.75; in 1974, $6,494.83; in 1975, $7,529.73. The high figure for 1973 thus represents an anomaly in a series ranging from six to eight thousand. I think it much more probable that Szimonisz's earnings, if not for the defendant's negligence, would have been in the range of eight to ten thousand in subsequent years, rather than the thirty to fifty thousand assumed by Dr. Crick in his various projections. Moreover, Szimonisz's personal consumption expenditures, which must be subtracted from the award, would probably have exceeded the 29% of income assumed by Dr. Crick based upon averages for Szimonisz's age and family structure. Szimonisz's personal consumption expenditures could be expected to exceed this average, due to the necessity of treating the pre-existing paranoid condition, and due to the fact that his consumption would have continued even if the paranoia prevented him from working for some period of time. In taking the factors of personal consumption expenditure and probable future earnings into account, I conclude that a reasonable figure for Szimonisz's lost earnings is $145,888.75. I adopt this figure as the most reasonable estimate of lost earnings in this case.

■ Szimonisz was survived by his wife and two young sons, as well as by his father. While obviously no figure can adequately compensate for the loss of a husband, father, and son, respectively, some reasonable figure must be arrived at for the

loss of his society and companionship. I believe that reasonable figures in this case would be $100,000 for the loss to Carol; $50,000 each for the loss to Gregory and Jaret Szimonisz, and $3,000 for the loss to Szimonisz's surviving father.

 There is also the question of compensation for Szimonisz's conscious pain and suffering, preceding his death which is attributable to the defendant's negligence. I find that $10,000 is a reasonable award.

I therefore find in favor of the plaintiff in the sum of $358,888.75. Judgment shall be prepared accordingly. This opinion shall constitute findings of fact and conclusions of law.