ROBERT BLATT, Respondent, v MANHATTAN MEDICAL GROUP, P. C., et al, Appellants.

First Department, October 20, 1987

#### APPEARANCES OF COUNSEL

*Harold L. Fisher* of counsel *(Kenneth Fisher, Eva C. Talel* and *Charles L. Brieant* with him on the brief; *Stroock & Stroock & Lavan* and *Fisher & Fisher,* attorneys), for appellants.

*Bradley B. Davis* for respondent.

#### OPINION OF THE COURT

MILONAS, J.

In this action seeking rescission of general releases and a

letter of resignation executed by plaintiff-respondent Dr. Robert Blatt in favor of defendants-appellants Manhattan Medical Group, Inc. (MMG) and Dr. Martin Gold, as well as monetary damages, judgment was awarded to plaintiff, after a jury trial, granting him both the requested rescission and damages in the amount of $250,000.

Plaintiff had worked for some nine years as a physician for MMG, a professional corporation operating a health clinic in Manhattan, whose director is Dr. Gold, when he was suspended without pay. The reason for the suspension was that following the end of an approved two-week leave of absence due to the sudden death of his father, he failed to report for duty on three successive Mondays, occasions on which he was scheduled to see patients. Each time, plaintiff telephoned from Florida shortly before his first appointment advising that he would be unable to be present that week, either because of his mother's illness and his need to remain with her or his own poor mental condition.

Plaintiff finally returned to New York three weeks later than expected. In addition to being suspended, plaintiff was requested to attend a board of directors meeting at which he appeared in the company of his counsel, a long-time family friend and experienced negotiator. The board, however, unanimously upheld his suspension, and, the next day, his resignation was solicited. Plaintiff was informed that the board wished to arrange a settlement with him. Thereafter, MMG conducted negotiations with plaintiff and his attorney, and plaintiff was eventually made an acceptable offer pursuant to which he was to receive $25,000 in severance pay, an increase from the initial tender of $15,000, plus the return of the value of his shares in defendant corporation, worth $3,000. He then signed and had notarized two general releases, which he brought to MMG's counsel. He also submitted a letter of resignation and, in return, was given a check for $28,000.

Plaintiff subsequently commenced the instant lawsuit to rescind the settlement, releases and resignation and for damages against MMG and Dr. Gold. The complaint alleged that at the time he agreed to terms with defendants, he lacked contractual capacity by reason of mental illness and that MMG and Dr. Gold knew or should have known of his condition. Plaintiff further asserted that he was compelled to resign under duress. At trial, the psychiatric testimony introduced by both sides concurred that Blatt had been suffering from a major depressive illness induced by the death of his father.

There was also some evidence that he may have had a preexisting personality disorder, and his mental condition could have damaged his ability to function properly. There was, however, no proof whatever that plaintiff's cognitive process was impaired or that he was incapable of understanding the nature and consequences of his actions when he executed the releases and letter of resignation. On the contrary, the record reveals, and plaintiff's psychiatrist admitted, that he did not appear to be suffering from a psychotic condition, that he was oriented as to time, place and person and that he was able to comprehend the nature of his actions and was fully capable of making a rational decision.

Indeed, plaintiff's own testimony indicated that he understood the purpose of the directors' meeting, the effect of the releases and that he was resigning in exchange for a $25,000 severance payment and that he knew that, if he refused to accept defendants' offer, he risked being fired without receiving anything. Dr. Gold, MMG's attorney, and one of the physician members of the board, who appeared as witnesses, stated that plaintiff seemed coherent and capable of understanding what he was doing. Moreover, plaintiff was represented throughout by a lawyer who was an experienced negotiator, had been a family friend for many years and was concerned for his client's welfare. In that regard, plaintiff's attorney asserted that while plaintiff was "overwrought" from the death of his father, he comprehended the consequences of his actions and knew that he was resigning. According to plaintiff's counsel, it was in his client's interest to resign rather than take the chance of being fired.

There is also no proof that plaintiff had consulted a psychiatrist prior to his resignation or that his behavior, except for his failure to report to work, was in any way out of the ordinary. All of the testimony, including that offered on behalf of plaintiff, indicated that at the time of the settlement, his appearance and demeanor were unremarkable. Further, plaintiff was not examined by a psychiatrist until approximately two months after he had left MMG. It is, thus, difficult to perceive how Dr. Gold or the other members of MMG, who were not themselves psychiatrists, could or should have known that he was mentally incapacitated simply because they were doctors.

It is, therefore, clear that based upon the insufficiency of evidence at trial, plaintiff failed to make out a prima facie case that he lacked contractual capacity by reason of mental

illness and that defendants knew or should have known of his impairment, and defendants' motion to dismiss the complaint should have been granted, and, indeed, this case should never have been submitted to the jury. The evidence at trial shows that plaintiff was severely depressed as a result of his father's death and possibly because of a personality disorder. However, if mere depression, serious or otherwise, can be considered a valid reason to avoid a contract or, for that matter, the consequences of any act, then the courts will be confronted with a plethora of claims by litigants declaring that they were too depressed or unhappy to know what they were doing and should, thus, be relieved from the effects of their conduct. The fundamental integrity and reliability of contracts which are the basis of our common commercial transactions would be greatly undermined if signatories thereto can seek to have them voided simply because they were depressed at the time these contracts were executed, even when represented by experienced counsel. The fact is that such a result establishes dangerous precedent, and there appears to be no legal authority which has released an individual from a contract on the ground of depression.

In *Ortelere v Teachers' Retirement Bd.* (25 NY2d 196, 203), the Court of Appeals acknowledged that the "traditional standards governing competency to contract were formulated when psychiatric knowledge was quite primitive. They fail to account for one who by reason of mental illness is unable to control his conduct even though his cognitive ability seems unimpaired." Accordingly, the court expressly expanded the old rule that a person's contractual mental capacity is determined by the cognitive test of whether his mind was "so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction" *(Aldrich v Bailey,* 132 NY 85, 89) and make a rational judgment concerning that transaction *(Paine v Aldrich,* 133 NY 544). Strict adherence to the cognitive rule has been superseded by a more flexible standard pursuant to which, as the Court of Appeals enunciated in *Ortelere* (at 205): "The avoidance of duties under an agreement entered into by those who have done so by reason of mental illness, but who have understanding, depends on balancing competing policy considerations. There must be stability in contractual relations and protection of the expectations of parties who bargain in good faith. On the other hand, it is also desirable to protect persons who may understand the nature of the transaction but who,

due to mental illness, cannot control their conduct. Hence, there should be relief only if the other party knew or was put on notice as to the contractor's mental illness."

The court in *Ortelere (supra)* recognized that while equitable relief may be available in certain circumstances notwithstanding the lack of knowledge by the other party of the contractor's mental illness, in general such knowledge is a prerequisite for the voidance of the contract. Thus, where the evidence indicates that a person is suffering from a psychosis which renders him or her incapable of making a voluntary decision, and the other party was, or should have been, aware of the contractor's condition, then the agreement may be voided (the so-called motivational test). While the court explained therein that "nothing less serious than medically classified psychosis should suffice or else few contracts would be invulnerable to some kind of psychological attack" *(Ortelere v Teachers' Retirement Bd., supra,* at 206), it is unclear that nothing less than a psychosis may be the predicate for avoiding a contract. The reason for this is that the standard of assessing competent conduct enunciated in *Ortelere* has been extended from contract law to tort law *(Fuller v Preis,* 35 NY2d 425) and now also includes a disability which " 'may fall short of psychosis or severe retardation and the act may be a voluntary judgment by the patient but still be a product of impulse or irrational behavior beyond his control' " *(Padula v State of New York,* 48 NY2d 366, 373). Since the Court of Appeals seems to be applying the same test of mental capacity to contract and tort claims, it may be that an individual who has not demonstrated a clinically classified psychosis may still be able to rescind a contract in some instances.

In the present situation, plaintiff has failed to show that his mind was "so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction" *(Aldrich v Bailey, supra,* at 89) and that, accordingly, he lacked the requisite contractual capacity (the so-called cognitive rule); or that his agreement with MMG was the result of impulsive or irrational behavior beyond his control and that defendants knew, or should have known, that he did not possess the proper capacity to enter into contracts (the motivational rule). Rather, all that the proof indicates is that at all times relevant herein, plaintiff comprehended the nature and consequences of his actions and made a rational judgment concerning the transaction. He was ably represented by counsel, who assisted him in negotiating an improved and

fair settlement and one which was deemed by him and his attorney to be in his best interests. The fact that he was in a severely depressed emotional state is scarcely sufficient indication that he did not have either the necessary understanding to execute a contract or that he was unable to control his behavior. An outcome which will, in all likelihood, encourage people to challenge otherwise valid agreements on the ground that they were depressed when they entered into them should not be condoned.

Consequently, the order and judgment (one paper) of the Supreme Court, New York County (Alfred M. Ascione, J.), entered on December 4, 1985, which, following a jury trial, *inter alia,* awarded plaintiff the sum of $250,000 in damages, plus costs, disbursements and interest, and found plaintiff to be entitled to rescission of the subject documents, should be reversed, on the law and the facts, and the complaint dismissed, without costs or disbursements.

SANDLER, J. P. (concurring). After a careful study of the record, I am persuaded that the plaintiff sustained a devastating professional and personal injury, and one that should never have been inflicted on him, when, after nine years of conscientious service as a doctor with the defendant corporation and its predecessor organization, he was forced to resign because of aberrational conduct which occurred during a period of mental illness that was precipitated by the death of plaintiff's father. Nevertheless, I have come to the regretful conclusion that the evidence presented at the trial does not support plaintiff's claim for relief under the most probably correct interpretation of the controlling rule set forth by the Court of Appeals in *Ortelere v Teachers' Retirement Bd.* (25 NY2d 196). Accordingly, I agree with the court that the judgment in plaintiff's favor must be reversed, and that the complaint should be dismissed, although I disagree with part of the analysis set forth in the court's opinion.

Because the facts seem to me to present an issue of more than ordinary interest, and because I am not convinced that the language in *Ortelere (supra)* that seems to me dispositive would necessarily represent the judgment of the Court of Appeals in a case precisely presenting the issue raised in this case, I think it may be helpful for me to set forth my separate analysis of the issues raised on this appeal.

In *Ortelere (supra),* the Court of Appeals reconsidered in the light of developing psychiatric knowledge the rules defining

the kind of mental incompetence that would render voidable contracts of persons who had not been adjudicated insane. The court said (at 202-203):

"Traditionally, in this State and elsewhere, contractual mental capacity has been measured by what is largely a cognitive test *(Aldrich* v. *Bailey,* 132 N. Y. 85; 2 Williston, Contracts [3d ed.], § 256; see 17 C.J.S., Contracts, § 133 [1], subd. e, pp. 860-862). Under this standard the 'inquiry' is whether the mind was 'so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction' *(Aldrich* v. *Bailey, supra,* at p. 89). A requirement that the party also be able to make a rational judgment concerning the particular transaction qualified the cognitive test *(Paine* v. *Aldrich,* 133 N. Y. 544, 546; Note, 'Civil Insanity': The New York Treatment of the Issue of Mental Incompetency in Non-Criminal Cases, 44 Cornell L. Q. 76) * * *

"These traditional standards governing competency to contract were formulated when psychiatric knowledge was quite primitive. They fail to account for one who by reason of mental illness is unable to control his conduct even though his cognitive ability seems unimpaired. When these standards were evolving it was thought that all the mental faculties were simultaneously affected by mental illness. (Green, Mental Incompetency, 38 Mich. L. Rev. 1189, 1197-1202.) This is no longer the prevailing view (Note, Mental Illness and the Law of Contracts, 57 Mich. L. Rev. 1020, 1033-1036)."

The court went on to describe briefly the movement to revamp legal notions of mental responsibility that occurred in the criminal law, and observed that while there are different policy considerations for the criminal law and the civil law, "both share in common the premise that policy considerations must be based on a sound understanding of the human mind and, therefore, its illnesses. Hence, because the cognitive rules are, for the most part, too restrictive and rest on a false factual basis they must be re-examined." *(Ortelere v Teachers' Retirement Bd., supra,* at 203.)

The court went on to observe *(supra,* 25 NY2d, at 204) as significant that the Restatement (Second) of Contracts, "states the modern rule on competency to contract * * * Thus, the new Restatement section reads: '(1) A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect * * * (b) he is unable to act

in a reasonable manner in relation to the transaction and the other party has reason to know of his condition.' (Restatement, 2d, Contracts [T.D. No. 1, April 13, 1964], § 18C.)"

Addressing the facts presented in *Ortelere (supra),* the court concluded that there should have been awareness of Mrs. Ortelere's condition, Mrs. Ortelere having previously been diagnosed as suffering from a psychosis.

Finally, the court went on to say *(supra,* at 206): "Of course, nothing less serious than medically classified psychosis should suffice or else few contracts would be invulnerable to some kind of psychological attack."

This last sentence, apparently limiting the revised rule to "nothing less than medically classified psychosis", seems to me dispositive of the issue in this case. The testimony is clear, and indeed uncontradicted, that the plaintiff suffered from a major depressive illness at the time of the conduct that led the defendants to demand and secure his resignation, and suffered from that illness at the time he agreed to do so. There is no evidence, however, that this depressive illness was accompanied by psychotic features at the time he agreed to resign, and there is no basis in the record for the conclusion that the defendants should have known that he was suffering from a medically classified psychosis at that time.

I am unable to persuade myself that the decision of the Court of Appeals in *Fuller v Preis* (35 NY2d 425) may reasonably be interpreted as overruling the statement in *Ortelere (supra)* that limited relief under the updated rule to "medically classified psychosis". *Fuller v Preis* involved the issue of causation in a tort case—specifically whether or not a suicide was caused by mental illness resulting from a negligently inflicted trauma. Whatever relationship may be thought to exist between the issue of mental illness as an element of causation in a tort case and as a factor rendering a contract voidable, it seems to me clear that the policy considerations are sufficiently different to preclude our interpreting the *Fuller* decision as overruling *sub silentio* the clear statement by the Court of Appeals in an opinion never referred to by the court in *Fuller.*

On the other hand, I recognize that in *Ortelere (supra),* the person whose mental competence was in issue had been diagnosed as psychotic, and that the Court of Appeals therefore had no occasion to consider the issue in a factual context in which a mentally ill person, although not psychotic, en-

tered into a manifestly inequitable contract as a result of his mental illness, and the other contracting party had reason to know of the mental illness. Moreover, an element of some uncertainty as to the Court of Appeals intent in *Ortelere* may be raised by the apparently unqualified endorsement in an earlier part of the opinion of the rule set forth in the Restatement (Second) of Contracts (now § 15), a rule not limited to the presence of "medically classified psychosis".

That the facts adduced at this trial would have supported rescission under the Restatement rule seems to me clear notwithstanding the contrary view set forth in the court's opinion. The evidence is clear, and indeed undisputed, that the plaintiff suffered a major depressive illness as a result of his father's death, that the aberrational conduct which led to his forced resignation was the result of that illness, and that he was mentally ill at the time he agreed to resign. At a minimum, the defendants knew that the conduct which led them to seek the plaintiff's resignation was unprecedented in the plaintiff's work history, was clearly aberrational, and that it was connected with an emotional response to his father's death. It may well be that the average person might not appreciate that this aberrational conduct could be the result of emotional illness, but I am unable to agree with the court that the doctors who constituted the board of directors of the defendant corporation could not reasonably have been thought by the jury to have had sufficient collective experience in their professional practices with unusual behavior in the aftermath of the death of a loved person to at least suspect the possibility of mental illness.

It should be noted parenthetically that even if the Restatement rule were to be accepted as the appropriate one, the judgment in plaintiff's favor would still have to be reversed because the trial court, quite understandably, charged the traditional cognitive rule, and the evidence does not seem to me to support a verdict for plaintiff under that test.

What I have written above adequately sets forth my response to the central legal issues presented. Let me add briefly my belief that the court's opinion does not adequately convey the wrong done the plaintiff by his forced resignation after nine years of conscientious service because of aberrational conduct during a period of mental illness following the death of a parent, and that it further understates the seriousness of the professional and emotional injury that the plaintiff sustained. The evidence strongly supports the jury's separate

factual conclusion that the terms of the settlement were not fair and reasonable. Without reviewing the facts in detail, I believe that any objective examination of the record would confirm that the compensation received by the plaintiff did not remotely compensate him for the loss that he sustained when he resigned.

Nor am I able to agree that plaintiff was "ably represented by counsel". Although it is unpleasant to be critical of a veteran lawyer who represented plaintiff without compensation because of feelings of good will arising out of the lawyer's relationship to the plaintiff's deceased father, it is quite clear from the record that plaintiff's lawyer never appreciated the significance of the rights that plaintiff surrendered when he resigned and the magnitude of the professional injury that he would sustain.

SULLIVAN, KASSAL and SMITH, JJ., concur with MILONAS, J.; SANDLER, J. P., concurs in a separate opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on December 4, 1985, unanimously reversed, on the law and the facts, and the judgment vacated and the complaint dismissed, without costs and without disbursements.