[710 NYS2d 334]

# Lynn G. et al., Respondents, v Norman Hugo, Appellant.

First Department, June 27, 2000

## APPEARANCES OF COUNSEL

*Morton Povman* of counsel (*Morton Povman, P. C.,* attorney), for respondents.

*Richard Paul Stone* of counsel (*Frederick N. Gaffney* and *Cathy A. Gallagher* on the brief; *Costello, Shea & Gaffney, L. L. P.,* attorneys), for appellant.

## OPINION OF THE COURT

ROSENBERGER, J. P.

Plaintiff Lynn G. brought the instant malpractice action against her former plastic surgeon, Dr. Norman Hugo, based upon two abdominal plastic surgeries performed by Dr. Hugo in February and November 1993. On February 9, 1993, Dr. Hugo performed a liposuction of the abdomen, flanks, thighs and knees, and a bilateral mastopexy, followed by an inner thigh liposuction and a full abdominoplasty on November 9, 1993. Prior to these operations, Mrs. G had had nearly 50 professional visits with Dr. Hugo, and had undergone a wide range of elective procedures, including eyelid surgery, facial liposuctions, removal of skin growths, wrinkle removal and tattoos on her eyebrows.

After the November 1993 procedure, Mrs. G expressed dissatisfaction with the appearance of her abdomen, claiming that there was unsightly scarring. She brought this action alleging medical malpractice based on a failure to obtain informed consent. First, she alleged that Dr. Hugo failed to advise her of less invasive alternatives to a full abdominoplasty, particularly since she had already had significant liposuction in that area just a few months previously. Second, she alleged that she was incapable of giving informed consent because she had Body Dysmorphic Disorder, which is the clinical name for a disproportionate preoccupation with minor or imaginary physical flaws. Between 1986 and 1990, Mrs. G had been under the care of a psychiatrist, Dr. Freiman, for depression. Dr. Hugo was aware that Mrs. G had been taking Elavil and Prozac while being treated by Dr. Freiman. Mrs. G claimed that her psychiatric history, combined with her unusually high demand for surgical correction of slight or imagined defects, should have alerted Dr. Hugo to the presence of a mental disorder that fueled her demand for unnecessary surgery and prevented her from assessing the risks and benefits of such surgery. At the very least, she contended, he should have consulted with a mental health professional before performing another invasive procedure on her.

The IAS Court properly denied defendant's motion for summary judgment, as there exist triable issues concerning plaintiff's alleged lack of informed consent to the abdominal cosmetic surgery performed in February and November 1993. First, the record reveals a factual dispute over whether Dr. Hugo departed from good medical practice by not advising Mrs. G of less invasive alternatives to the abdominoplasties he performed (*see, Andreach v Mount Sinai Med. Ctr.*, 253 AD2d 397). Public Health Law § 2805-d (1) states: "Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable * * * practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation."

Dr. Hugo admitted that after Mrs. G was dissatisfied with the February 1993 surgery, he never discussed any options other than a mini or full abdominoplasty for the November 1993 operation. This is confirmed by Mrs. G's deposition testimony. However, the affidavit from Mrs. G's plastic surgery expert opines that Dr. Hugo should have suggested a suction-assisted lipectomy as a less invasive alternative. This itself is sufficient to raise a triable issue (*see, Andersen v Delaney*, 269 AD2d 193; *Lowery v Hise*, 202 AD2d 948, 949).

The dissent emphasizes that Dr. Hugo did not pressure Mrs. G into any course of action, but lack of informed consent can also be predicated on the doctor's failure to disclose a complete range of options (*Eppel v Fredericks*, 203 AD2d 152). A patient cannot accurately assess the risks and benefits of a procedure if she mistakenly believes that the only alternative is inaction. The benefits to be derived from the procedure may appear greater, or the risks more worthwhile, than they would appear if she knew that there was a way to achieve a similar benefit with less risk.

Nothing in Public Health Law § 2805-d (1), nor in the case law applying the statute, suggests that elective cosmetic surgery is subject to a less stringent disclosure standard (*see, Lee-Lu Pan v Shaw*, 203 AD2d 195; *Bellier v Bazan*, 124 Misc 2d 1055). Though the patient's identification of the problem (e.g., a sagging stomach) may be motivated by subjective vanity rather than objective physical impairment, once the patient has decided that this feature is a problem that needs to be corrected, the doctor should have no less of a duty to disclose the risks of any treatment he could offer. In other words, while the

patient's dissatisfaction with her body may be a matter of taste, the choice of treatments and the expected outcomes are governed by objective medical principles. Disclosure of less invasive alternatives is merely one aspect of the doctor's general duty to present a full picture of the risks and benefits.

With respect to the "combination" of liposuction and abdominoplasty, the dissent reads "combination" to be synonymous with "simultaneous." They allege that plaintiff's plastic surgery expert misreads the record in speaking of the combination of procedures. The words "combination" and "simultaneous" do not have the same meaning in this context, as they do not in most contexts. In recent years, most of us have had the unfortunate experience of knowing, or at least reading of, people who have suffered with cancer. It is also common knowledge that cancer is often treated by a combination of radiation, chemotherapy, and surgery. It is also common knowledge that each of these therapeutic modalities is not performed simultaneously with the others. Nor did plaintiff's expert in this case say or suggest that the two modalities in this case were performed simultaneously. His statement that "significant truncal liposuctions should not be combined with classic abdominoplasty" is properly read as a statement of opinion that abdominoplasty presents more complications for a patient who has recently had extensive liposuction on the same part of the body.

It is irrelevant that Dr. Hugo was not the only plastic surgeon who treated Mrs. G during her lifetime. He was the only one she consulted about the particular procedures complained of here. The responsibility of informing her about all her treatment options rested in his hands alone.

Further factual questions regarding informed consent are presented by Mrs. G's allegation that she suffered from Body Dysmorphic Disorder (BDD) and that Dr. Hugo should have made further inquiries into her mental state before proceeding with the abdominoplasties. The dissent misleadingly exaggerates Mrs. G's position. She is not arguing that her depression made her incapable of entering into a contract, nor that BDD renders a person unable to give informed consent to surgery in general. Nowhere is it urged that this Court should impose a general rule requiring preoperative psychiatric referral of all plastic surgery candidates, or even of all such candidates who have taken antidepressants. She merely claims that her mental state affected her ability to assess the risks and benefits of one particular type of treatment, namely, elective cosmetic surgery,

because persons with this disorder have irrationally exaggerated perceptions of their bodily imperfections. Particularly in the area of cosmetic surgery, when there is no medical need for the operation and only the patient's subjective aesthetic opinion determines her view of whether surgery is to be undertaken, a physician should have some responsibility to provide objective guidance to a patient whose capacity for self-assessment is clearly disordered.

Dr. Hugo's self-confessed approach is to present patients with the options and let them decide whether to undergo a procedure, but not to advise them whether one procedure is better than another or better than doing nothing at all. This laissez-faire attitude may not be sufficient, however, when the patient's judgment appears to be impaired.

On the medical questionnaires Mrs. G filled out prior to her cosmetic surgery treatments, she not only disclosed that she was using the antidepressant Prozac (and had used Elavil before that), but also indicated that she suffered from "extreme nervousness or anxiety" and had previously been taking prescription medication for migraines. Her history of depression was also noted on Columbia Presbyterian's November 4, 1993 preoperative report, which was attached to her consent form for the November 9, 1993 abdominoplasty. When this history is coupled with Mrs. G's extraordinary eagerness for surgical alteration—a nose reconstruction by a previous surgeon, followed by 51 visits to Dr. Hugo over a six-year period, including three facial liposuctions, eyelid surgery, pigment tattooed onto her eyebrows, and periodic injections of fat and Botox (botulism toxin) to smooth out facial wrinkles—it raises, at the very least, an issue as to whether Dr. Hugo should have sought advice from a mental health professional before performing more and more invasive procedures upon Mrs. G.

Indeed, Dr. Hugo's deposition reveals an almost complete lack of curiosity about his patient's mental state. He testified that Mrs. G mentioned to him that she was taking Prozac. He characterized this as a "mood elevator," but he apparently asked no follow-up questions. This was his only conversation with her about her antidepressant medication. When she first came to him, she had been using Elavil, another antidepressant, but Dr. Hugo had gathered no further information because "it did not seem as if it was worthy of being pursued." He never endeavored to discover the dosage, length of use, or symptoms giving rise to his patient's use of antidepressants.

Lastly, he testified that he had never even heard of Body Dysmorphic Disorder. This is a disturbing confession of

ignorance from a doctor who said he was a professor at Columbia University's medical school teaching hospital and the chief of the plastic surgery division of its hospital, Columbia-Presbyterian, particularly since Columbia-Presbyterian had a BDD clinic when Mrs. G was his patient (*see*, Sherman, *Do I Look Fat?*, New York Newsday, June 5, 1993, section II, at 17). One might expect a plastic surgeon to be cognizant of an established psychiatric condition that affects body image and could impair a patient's ability properly to appraise and consent to cosmetic surgery.

According to the dissent, even if Dr. Hugo had referred Mrs. G to a psychiatrist, such a step would have been futile because she had already disregarded the opinion of her former psychiatrist, Dr. Freiman, that she should stop having so much surgery. This cursory analysis sidesteps an important component of her claim, namely, that *Dr. Hugo* should have consulted a mental health professional for advice about how to proceed, or otherwise attempted to explore his patient's psychiatric history, once her behavior raised warning signals that her judgment was impaired (*see*, *Ross v Community Gen. Hosp.*, 150 AD2d 838, 840-841 [physician's negligent failure to request accurate information from radiologist]). Plaintiff's expert physicians, a plastic surgeon and a psychiatrist, expressed the opinion that failure to make such an independent investigation was a negligent departure from acceptable medical practice, given Mrs. G's behavior. This raises an issue of fact sufficient to withstand summary judgment (*see*, *Slaybough v Nathan Littauer Hosp.*, 202 AD2d 773, *lv dismissed* 83 NY2d 962).

On a motion for summary judgment, the court should engage in issue finding, not issue determination (*Masucci v Feder*, 196 AD2d 416, 420). The dissent's opinion appears to be based, in part, on a determination that Mrs. G did not have BDD. This conclusion is premature. Defendant's expert is of the opinion that Mrs. G did not display enough of the standard symptoms of BDD to warrant such a diagnosis, while plaintiffs' experts give specific reasons for reaching a contrary conclusion, such as her history of obsessive preoccupation with and exaggeration of her bodily imperfections. This factual dispute is for the jury to resolve.

Furthermore, the dissent treats as dispositive the absence of evidence that Dr. Freiman communicated to her a diagnosis of BDD, while discounting a positive diagnosis by her two experts because they occurred more than four years after Dr. Hugo's operation. It is to be noted that when asked whether Dr.

Freiman had told her she "had" BDD, she responded "We discussed it." Dr. Freiman's 1984-1988 treatment of Mrs. G is no closer in time to the disputed 1993 surgery than are the experts' examinations in 1998. These considerations merely go to the weight to be afforded to the evidence, which is not for us to evaluate at this juncture.

Finally, we disagree with the dissent's contention that Mrs. G will have no way to prove that she suffered from BDD because Dr. Freiman's records and testimony are unavailable. The admissible evidence includes her own deposition testimony as well as the opinions of her medical experts, which defendant's expert disputes based on his examination and evaluation of Mrs. G.* The weight to be afforded to experts' conflicting testimony is a matter best reserved for the jury (see, Gleeson-Casey v Otis El. Co., 268 AD2d 406).

Accordingly, the order of the Supreme Court, New York County (Stanley Sklar, J.), entered July 1, 1999, which, inter alia, denied defendant's motion for summary judgment dismissing the complaint, should be affirmed, without costs.

WALLACH, J. (dissenting).

John Keats, who studied medicine before turning to the verse and rhyme, delivered the edict that " 'Beauty is truth * * * ' [and] that is * * * all ye need to know."[1] Sadly, the poet died young. But from our perspective of age and time, we may feel confident that the Grecian who crafted the urn which inspired such lofty sentiment undoubtedly knew something else: that an unrelenting involvement with self-beautification ofttimes ends up at the bottom of the well of Narcissus. A similar cautionary tale is presented in the case before us.

This medical malpractice action arises from two separate abdominal plastic surgeries performed by defendant upon the female plaintiff in February and November 1993. Aside from Mr. G's derivative cause of action for loss of consortium, four discrete claims can be distilled from the complaint and bill of particulars:

Just prior to the operations, the patient had suffered from a mental syndrome known as Body Dysmorphic Disorder (BDD),

---

* The dissent makes much of the absence of an affidavit from Mrs. G, and gives the misimpression that therefore we have no testimony by Mrs. G in the record, when in fact 35 of the 112 pages of her deposition testimony are reproduced there. It should be noted, as well, that there was no affidavit from the movant, Dr. Hugo.

1. *Ode on a Grecian Urn* (1819).

rendering her mentally incapable of consenting to the surgeries; in such circumstances, defendant was duty bound to refer his patient to a psychiatrist before proceeding.

Defendant failed to advise his patient of less invasive alternative procedures.

Administering a "combination" of liposuction and abdominoplasty was itself malpractice.

Both surgical procedures were unnecessary because they were designed to correct only "slight" or "imagined" defects.

Upon completion of discovery, defendant moved for summary judgment. Clearly, the greater emphasis in plaintiffs' response was on the patient's alleged lack of informed consent than on defendant's actual surgical performance. Finding triable issues of fact, based upon the conflicting testimony of expert witnesses, the IAS Court denied the motion. We disagree.

Mrs. G, then 43 years old, first met defendant in 1987, when she accompanied her daughter for a rhinoplasty (plastic surgery to alter the shape or size of the nose). Mrs. G had undergone such a procedure by another surgeon 16 years earlier. Even though she claims not to have been satisfied with the daughter's rhinoplasty, she herself returned for a consult with defendant in 1988. She saw him professionally 50 more times through February 1994, including twice in the hospital for surgical procedures. In January 1989, after discussing and acknowledging the risks of such surgery, she underwent an upper and lower blepharoplasty (aesthetic eyelid surgery) at defendant's office. Pleased with these results, she discussed other procedures with defendant. In late 1990 she underwent the first of three liposuctions (removal of fat) on her chin, and in 1991 defendant performed tattoos (introduction of pigment) on her eyebrows. Throughout this period defendant surgically removed various skin growths (lesions, papillomas, skin tags and keratoses) from different parts of her body, and in 1990 he began a series of periodic fat injections to smooth out facial wrinkles.

On February 9, 1993, Mrs. G entered Columbia Presbyterian Hospital for a liposuction of the abdomen, flanks, thighs and knees, and a bilateral mastopexy (correction of sagging breasts), *inter alia*. Defendant had discussed these procedures with his patient over the previous two years. On this, her 28th visit to defendant, Mrs. G acknowledged in writing the risks they had discussed with regard to these procedures.

For the rest of that year, Mrs. G continued to see defendant for postoperative examination and various dermatological

procedures on an out-patient basis. In October they discussed liposuction on the inner thighs and a full abdominoplasty (surgery on the abdominal wall for aesthetic purposes). These and other minor procedures were performed at Columbia Presbyterian on November 9, 1993, again after independent review of the risks with both defendant and a plastic surgery resident, and Mrs. G's written acknowledgment. This was her 40th professional contact with defendant since 1988.

Mrs. G continued to see defendant for postoperative examination and unrelated procedures through February 1994. Defendant claims on January 12 to have found his patient "virtually healed" from the latest surgery, and on February 23—her 51st and final visit—he pronounced that the abdomen "look[ed] good." Mrs. G canceled subsequent appointments scheduled for March 9 and April 11. On April 29, in a telephone call from defendant's office, Mrs. G responded that her breast scars had healed well. Stating more than once that she "liked" and "loved" Dr. Hugo, Mrs. G reported nevertheless that she and her husband were dissatisfied with the appearance of her abdomen, and had visited other plastic surgeons to see if the problem could be "fixed." Mrs. G "agreed to come into the office to discuss the problem," and an appointment was scheduled for 2:00 P.M. on December 14, 1994. Not only were there no further visits, but this telephone call was the last contact between the parties until commencement of this action in July 1995.

1. Body Dysmorphic Disorder

In 1986, seven years prior to the alleged malpractice, Mrs. G placed herself under the care of a psychiatrist, Dr. Gerald Freiman, to alleviate feelings of depression. She stopped seeing Dr. Freiman in 1990, her condition having improved with Prozac. Defendant was aware, at the time of the surgeries in 1993, that Mrs. G had been taking Elavil and Prozac. Two medical experts for plaintiffs—a psychiatrist and an osteopathic surgeon specializing in plastic surgery—stated that, in their opinion, defendant should not have performed surgery on this patient without a preoperative psychological referral. The psychiatrist further opined that a patient in Mrs. G's condition could not have made an informed consent to such surgery because her history was "consistent with a form of Body Dysmorphic Disorder."[2]

---

**2.**  In the bill of particulars, defendant was accused of performing surgery on a patient who displayed "obvious Body Dysmorphic Disorder." This allegation was never raised in the complaint.

BDD, also known as dysmorphophobia, is defined as preoccupation with a slight or imagined defect in appearance, causing significant distress or functional impairment, and which cannot be accounted for by another mental disorder[3] (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders[4] 466ff [4th ed 1994]). There is no evidence of such distress or impairment, nor any indication that Dr. Freiman ever diagnosed or treated Mrs. G for such a disorder. Defendant's demand for disclosure of Dr. Freiman's file on Mrs. G was met with the explanation (unconfirmed by any police report) that these records had been stolen or destroyed in an office burglary. Efforts were made to subpoena Dr. Freiman for testimony, but unfortunately, he died before he could be deposed.

At her deposition, Mrs. G was asked if Dr. Freiman had ever told her she was suffering from BDD. "We discussed it," she answered. When asked what Dr. Freiman had said about it, she replied simply that "He thought I was crazy for wanting to have surgery." That rather nonmedical remark is the closest this record has to a diagnosis of BDD. Indeed, throughout four years under his care, Mrs. G could not recall Dr. Freiman diagnosing her with *any* condition. Furthermore, and somewhat astonishingly, is the absence of any affidavit from Mrs. G herself, in response to the summary judgment motion, addressing this or any other issue.[5] Mrs. G has never stated for the record that she suffered from, or was ever diagnosed with, BDD. We are thus left with the views of medical experts who have offered opinions based upon their review of this case, and their examinations of Mrs. G conducted more than four years after she last saw defendant. On a motion for summary judgment, mere speculation by an expert cannot substitute for the necessary causal link between defendant's surgery and the patient's alleged injury (*Horth v Mansur*, 243 AD2d 1041, 1043).

Defendant's medical expert, Dr. Altchek, stated that it was not uncommon for patients on mood-elevating medication to undergo plastic surgery. Nevertheless, Mrs. G's taking of such

---

**3.** Throughout the vast body of American jurisprudence, this malady is fleetingly referred to in only one reported case (*State v Guthrie*, 194 W Va 657, 666, 461 SE2d 163, 172), where an accused murderer suffered from a chronically obsessive fixation with his nose.

**4.** Appellate courts have cited this text as authoritative (*see, e.g., People v Taylor*, 75 NY2d 277, 287).

**5.** Even the complaint and bill of particulars were signed and verified only by plaintiffs' attorney.

drugs, together with her five-year history with defendant and the opinion of her psychiatric expert that her condition was "consistent with a form of" BDD, was held sufficient to create a triable issue whether defendant had committed malpractice. In our view, this record, even when overlaid with the speculative opinions of plaintiffs' experts, falls far short of the evidentiary threshold to warrant a trial. The furthest plaintiffs' expert dared to venture was that Mrs. G's symptoms were "consistent with a form of" BDD.[6] Mrs. G's testimony that she had briefly discussed BDD with her psychiatrist constitutes no diagnosis, much less a foundation, upon which to build a new set of duties to be imposed upon plastic surgeons.

The majority suggests that Mrs. G may be able, at trial, to cure the gaping hole in her proof, based in part on "her own testimony." But there is no such testimony, and the majority fails to point to any source for the ultimate production of such proof. While plaintiffs may hope, as did Mr. Micawber, that "something may always turn up," this has never been a basis for denying summary judgment (*see, Zuckerman v City of New York*, 49 NY2d 557, 562; *Straton v Orange County Dept. of Social Servs.*, 217 AD2d 576).

Plaintiffs relate their allegation of malpractice to Mrs. G's lack of informed consent by reason of mental impairment due to her depression. But a contractual consent may not be voided on the ground that the party granting it was suffering from depression (*Blatt v Manhattan Med. Group*, 131 AD2d 48). Nor, for that matter, is there any evidence that BDD, even if established, would render Mrs. G incompetent to consent to surgery.

We reject the notion that this record warrants the imposition of a psychiatric referral requirement for the benefit of the plastic surgeon himself. The pronouncement of such a blanket rule, imposed under threat of a malpractice lawsuit if not complied with, is far beyond the competence of any court. It represents an unacceptable form of judicial legislation by creating a subclass of both surgeons and patients who would require psychiatric guidance before undertaking elective surgery. Such

---

**6.** This expert never explained what these symptoms were. In contrast, defendant, in his deposition, referred to a list of objective circumstances (excess eyelid tissue, excess fat in the abdomen, sagging of the abdomen, fat in the thighs, wrinkles) that would precisely negate a diagnosis of BDD. Defendant's immediately preceding "confession" that he had never heard of BDD hardly matters in a case where no evidence of that disorder was ever discovered in this patient, even after the most rigorous efforts fueled by hindsight.

a requirement would judicially impose a significant cost, the limits of which can only be imagined. Furthermore, there is no indication in this case that Mrs. G, having already ignored Dr. Freiman's advice, would have heeded similar advice from anyone else. In short, there is no causal relationship between defendant's failure of referral and Mrs. G's alleged injury. As for defendant, any supposed benefit to him in aid of his treatment of Mrs. G is based on pure speculation.

## 2. Alternative Less Invasive Procedures

From 1988 until 1993, over the course of dozens of visits to defendant, Mrs. G had the opportunity to discuss and consider all manner of procedures relating to purely cosmetic surgery, and the risks related thereto (*cf., Osorio v Brauner*, 242 AD2d 511, *lv denied* 91 NY2d 813). This was not the first plastic surgeon she had consulted, nor would it be the last. Defendant testified that he never recommends any particular procedure, but merely gives an explanation and lets the patient make the decision. There is no basis in this record to infer that Mrs. G was somehow pressured into any particular course of action.

It should be noted that Mrs. G executed a signed consent form in connection with the abdominoplasty. Plaintiffs have offered nothing to undermine the legal efficacy of that declaration. Given the undisputed facts of her deep experience with plastic surgery, this knowledgeable consent is decisive.

## 3. The "Combination" of Liposuction and Abdominoplasty

The statement by plaintiffs' plastic surgery expert, to the effect that "significant truncal liposuctions should not be combined with classic abdominoplasty," is based upon a misreading of the record. Mrs. G did not undergo such procedures simultaneously. The only liposuction performed on her at the time of the abdominoplasty in November 1993 was on her inner thighs, which are part of the body's extremities, not the trunk. The truncal liposuction had been performed in February, with a touch-up in defendant's office in May. The possibility of abdominoplasty was noted as early as June and discussed in October, but that procedure was not scheduled until November, specifically because defendant wanted to wait an appropriate period of time to allow healing from the liposuction. Exactly nine months elapsed between the truncal liposuction and the abdominoplasty, and six months if counting from the office touch-up. It was thus irrelevant for plaintiffs' expert to suggest that Mrs. G had been exposed to greater complications of scarring and cosmetic deformity by reason of "combined" surgery, because such a "combination" of procedures never occurred.

### 4. "Unnecessary" Surgery

All of the surgical procedures undergone by Mrs. G were elective in nature. There is, again, no evidence in the record that Mrs. G was deceived or coerced into undergoing these procedures with an absence of adequate knowledge. Plaintiffs' general allegations are insufficient in the face of defendant's motion for summary judgment. In opposing such a motion, neither a conclusory allegation unsupported by competent evidence nor rank speculation as to a better course of action is an appropriate substitute for the level of admissible proof required to establish material issues of fact on the essential elements of medical malpractice (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 325; *Tungsupong v Bronx-Lebanon Hosp. Ctr.*, 213 AD2d 236, 238; *see also, Pan v Coburn*, 95 AD2d 670).

In conclusion, we are chided by the majority, in a footnote, for creating a "misimpression" in noting the absence of any affidavit from Mrs. G, the implication being that defendant should be tarred with the same brush. This argument ignores the reality of how the record was built in this case. It was defendant who moved for summary dismissal based upon the equivocations, evasions and shortcomings in Mrs. G's deposition, which we cite in detail. Manifestly, Mrs. G's deposition testimony left her case in a gravely weakened, if not terminal, condition. Her failure to come forward on this motion with an affidavit explaining these deficiencies speaks volumes as to the lack of merit of her cause. In contrast, the actions of defendant are all established by admissible medical records and other competent proof. It would be counterproductive for him to submit a cumulative affidavit: anything favorable would be dismissed as self-serving, and the minutest disagreement with either of plaintiffs' experts or Mrs. G herself could be seized upon as providing a triable issue of fact. Wisely, defendant did not rise to the bait. Unfortunately for Mrs. G, her silence has failed to provide a triable issue of fact.

We would reverse the order on appeal and grant defendant's motion for summary judgment dismissing the complaint.

WILLIAMS and ELLERIN, JJ., concur with ROSENBERGER, J. P.; WALLACH and SAXE, JJ., dissent in a separate opinion by WALLACH, J.