Richelle RIVERA, Plaintiff,

v.

SOVEREIGN BANK, Defendant.

No. 11–CV–1618 (NGG)(VMS).

United States District Court,
E.D. New York.

Sept. 30, 2013.

Gamiel A. Ramson, Law Offices of Gamiel A. Ramson, New York, NY, for Plaintiff.

Kathryn J. Russo, Jackson Lewis, LLP, Melville, NY, for Defendant.

## MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, District Judge.

Before the court are Plaintiff's objections to Magistrate Judge Vera M. Scanlon's Report and Recommendation ("R & R") that advised granting Defendant's mo-

tion for summary judgment. For the reasons set forth below, the R & R is ADOPTED in full.

## I. BACKGROUND

Plaintiff Richelle Rivera brought this action against Defendant Sovereign Bank for violations of civil rights under federal, state, and city law, arising out of her employment with Defendant. (Am. Compl. (Dkt. 7).) Defendant subsequently asserted its intent to seek dismissal or summary judgment on the grounds that Plaintiff had waived any claims against Defendant. (Apr. 8, 2011, Def. Ltr. (Dkt. 5).) The court directed discovery solely on the issues of the existence and validity of a release of liability between Plaintiff and Defendant, and the court further instructed that the intended summary judgment motion be referred to Magistrate Judge Andrew M. Carter for a report and recommendation. (Nov. 9, 2011, Minute Entry.) On December 9, 2011, the assignment of this case was transferred from Judge Carter to Magistrate Judge Steven M. Gold, and on August 17, 2012, the assignment was transferred from Judge Gold to Magistrate Judge Scanlon. Defendant's motion to dismiss for failure to state a claim or, in the alternative, for summary judgment, was fully briefed as of October 25, 2012 (*see* Dkts. 12, 20, 21), and on December 3, 2012, Defendant withdrew its motion to dismiss, leaving its pending motion to be considered as a motion for summary judgment (Dec. 3, 2012, Minute Entry).

On August 30, 2013, Judge Scanlon issued an R & R, recommending that the court grant Defendant's motion for summary judgment and dismiss Plaintiff's action in its entirety. (R & R (Dkt. 25).) On September 20, 2013, Plaintiff filed written objections to the R & R (Pl. Obj. (Dkt. 27).) The full history of the case is discussed in detail in the R & R. (R & R at 275–79.)

## II. STANDARD OF REVIEW

When a magistrate judge issues an R & R and that R & R has been served on the parties, a party has fourteen days to object to the R & R. Fed.R.Civ.P. 72(b)(2). If the district court receives timely objections to the R & R, the court makes "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The district court] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). However, to obtain this de novo review of a magistrate judge's R & R, an objecting party "must point out the specific portions of the report and recommendation to which [he] object[s]." *U.S. Flour Corp. v. Certified Bakery, Inc.*, No. 10–CV–2522 (JS), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6, 2012).

If a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 51 (E.D.N.Y.2008); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir.2002) (holding that plaintiff's objection to an R & R was "not specific enough" to "constitute an adequate objection under … Fed.R.Civ.P. 72(b)"). Portions of the R & R to which a party makes no objection are also reviewed for clear error. *U.S. Flour*, 2012 WL 728227, at *2.

## III. DISCUSSION

Plaintiff purports to object to two aspects of the R & R:

One, the Magistrate one-sidedly discounts every assertion by Plaintiff of her mental condition at the time of the sign-

ing of the release, despite Plaintiff's deposition testimony and Affidavit to the contrary and, two, the Magistrate assumes as fact that there was a bona fide reduction in force that was applicable to Plaintiff even though this is a contested issue that was not to be decided in this motion before the Court.[1]

(Pl. Obj. at 1.) Plaintiff's objections are contained in a letter brief consisting of ten substantive paragraphs, only three of which contain more than one sentence. (*Id.* at 1–3.) Plaintiff's objections raise no new issues or arguments, are highly generalized, and include just a single case citation. (*Id.*) To the extent Plaintiff's objections can charitably be construed as specific, they will be analyzed de novo; those objections that are wholly conclusory and general require clear error review.

## A. Consideration of Evidence Regarding Plaintiffs Mental Condition

Plaintiff claims the R & R "one-sidedly discounts every assertion by Plaintiff of her mental condition ... despite Plaintiff's deposition testimony and Affidavit to the contrary." (*Id.* at 1.) Plaintiff is incorrect. The R & R extensively discusses all available evidence relating to Plaintiff's mental condition—and therefore relating to whether the release Plaintiff executed was validly signed. (R & R at 279–85.) As for Plaintiff's federal claims, the R & R properly analyzes the evidence relating to Plaintiff's mental capacity in connection

with the *Bormann* factors. (*Id.* at 280–85 (citing *Bormann v. AT & T Commc'ns, Inc.*, 875 F.2d 399, 403 (2d Cir.1989).) The R & R correctly explains that a "party's capacity is presumed, and, to overcome this presumption, the party carries an 'extremely heavy' burden of demonstrating that she lacked capacity at the time of the disputed transaction." (*Id.* at 280 (citation omitted).) More specifically, in analyzing Plaintiff's mental condition, the R & R notes that "a plaintiff's own claim of a lack of mental capacity without the support of some *objective evidence* is not a sufficient basis upon which a court can find that a plaintiff has raised an issue of material fact to justify undoing an agreement." (*Id.* at 281 (emphasis added) (citing *McKenna v. Ward*, No. 88–CV–0513 (JFK), 1997 WL 66779, at *6 (S.D.N.Y. Feb. 18, 1997)); *Reid v. IBM Corp.*, No. 95–CV–1755 (MBM), 1997 WL 357969, at *7–8 (S.D.N.Y. Jun. 26, 1997)).)

■ The R & R discusses numerous reasons why Plaintiff's argument must fail. The R & R notes that although "Plaintiff states that she suffered from a mental illness and extrapolates that she could not have knowingly and voluntarily entered into the release," she "does not offer any medical evidence" supporting her argument as to incapacity at the time she signed the release. (R & R at 282.) Indeed, Plaintiff "never explains what about her illness impeded reasonable decision-making." (*Id.*) Plaintiff's testimony itself

---

1. Plaintiff also notes that the R & R "begrudgingly admit[s] that Plaintiff received a relatively small amount of money paid in the release, and this is a very strong argument in weighing the equitable factors of *Bormann* ...." (Pl. Obj. at 2) (citations omitted.) Plaintiff does not articulate if or how the R & R improperly weighed this fact in its *Bormann* analysis. In relation to the *Bormann* factor of whether Plaintiff had an attorney when she signed the severance agreement, the

R & R acknowledged that the amount of severance offered Plaintiff *relative to* standard New York area legal rates could make consulting with an attorney "economically impractical" (R & R at 284 n. 6), but it was an opportunity extended to Plaintiff nonetheless. As *Bormann* requires an analysis of the totality of the circumstances, any weight assigned this fact in Plaintiff's favor was rightly outweighed by the other *Bormann* factors, as concluded by the R & R.

demonstrates that she made a rational decision to enter into the agreement. (*See* Pl. Dep. at 71–73, 75–80.) She signed the agreement because, in her own words, she "needed the money," which is a perfectly reasonable motivation and one that suggests she had sufficient decision-making abilities at the time. (*Id.* at 73, 78–79.) Additionally, Plaintiff testified that at the time she signed the release, she was ready and able to return to her position at the bank, which required focused cognitive abilities. (*Id.* at 43, 69, 84.) The fact that Plaintiff was capable of the high-level functioning required for her job strongly suggests that she was able to understand the release.

Plaintiff's claim that her treatment for mental health proves she was unable to validly sign the contract is also unavailing. *See McIntosh v. Consol. Ed. Co. of N.Y., Inc.*, 216 F.3d 1072 (2d Cir.2000) (affirming district court conclusion that plaintiff was not impaired by antidepressant medication); *Cardona v. Cmty. Access, Inc.*, No. 11–CV–4129 (MKB), 2013 WL 304519, at *5 (E.D.N.Y. Jan. 25, 2013) ("Plaintiffs' assertion that they suffer from anxiety is not enough to demonstrate that they suffered from a condition that was debilitating enough to prevent them from [validly entering into a contract].") (collecting cases). On the contrary, Plaintiff's treating physician, Dr. Ludmila Davidov, and treating social worker, Ms. Melissa Wannamaker, provided testimony that undercuts Plaintiff's claims that she lacked the requisite mental capacity at the time she signed the release. Although Dr. Davidov diagnosed Plaintiff with post-traumatic stress disorder and mild post-partum depression, she believed that Plaintiff was well-oriented to reality as of early May 2009 and did not think that Plaintiff's judgment was impaired in late June 2009. (Davidov Dep. (Dkt. 12–4) at 59–61, 64–66.) Likewise, Ms. Wannamaker diagnosed Plaintiff with adjustment disorder and pronounced anxiety, but also found that Plaintiff's grasp on reality was never impaired. (Wannamaker Dep. (Dkt. 12–7) at 17–17.) Plaintiff fails to counter this testimony with objective evidence that her disorders or treatment were so debilitating as to inhibit her capacity to enter a contract.

█ The same evidence fairly supports the R & R's analysis of the release of Plaintiff's claims under New York State and City law. As with federal law, New York law finds that existence of a person's mental illness in general is not sufficient to prove that person was incapable of forming a contract. *See Scarfone v. Vill. of Ossining*, 23 A.D.3d 540, 806 N.Y.S.2d 604, 605 (2d Dep't 2005); *Matter of Verdugo v. Peachtree Funding Northeast*, 500137/09, N.Y.L.J. 1202608540669, 41 Misc.3d 1221(A), 2013 WL 5809636 (N.Y.Sup.Ct., May 29, 2013; published June 28, 2013); *Reid v. IBM Corp.*, No. 95–CV–1755, 1997 WL 357969, at *7 (S.D.N.Y. June 26, 1997). Rather there must be credible evidence that the illness "interfered with a person's ability to understand the contract or act in his or her best interest." (R & R at 286 (citing *Blatt v. Manhattan Med. Grp., P.C.*, 131 A.D.2d 48, 519 N.Y.S.2d 973, 975 (1st Dep't 1987)).) To assess the effects of alleged mental illness, New York courts look to objective evidence. Because Plaintiff has put forward no objective evidence demonstrating that her condition hindered her ability to comprehend and rationally sign the severance agreement, she has failed to make the required showing.

In sum, Plaintiff's general and conclusory objection that the R & R discounted Plaintiff's assertions is wholly without merit. Rather, the R & R thoroughly analyzed Plaintiff's arguments and found they failed to meet the required standard for abrogating the waiver on the basis of

mental incapacity. The R & R's analysis is correct as to the law and the facts, and Plaintiff's objection is overruled.

### B. Consideration of Reduction in Force

Plaintiff's second specific objection is that the R & R "assumes as fact that there was a bona fide reduction in force ["RIF"] that was applicable to Plaintiff even though this is a contested issue that was not to be decided in this motion before the Court." (Pl. Obj. at 1.) This assertion is both false and irrelevant to the outcome of the decision on summary judgment.

First, the R & R assumed no such thing. The R & R initially refers to Defendant's description of the RIF as a "claim" (R & R at 275–76) and subsequently describes the evidence relating to the RIF in more detail, discussing the evidence adduced by Defendant and noting that "Plaintiff denies that Defendant had a reduction in force, but she offers no evidence to the contrary." (*Id.* at 278 n. 2.)

Second, even if the R & R had misconstrued the evidence relating to the RIF, it makes no difference in the analysis (or outcome) at issue. The details of the RIF—or, in Plaintiff's argument, its non-existence—relate to Plaintiff's underlying civil rights claims and only need be explored if those claims are permitted to go forward, the release notwithstanding. Defendant's motion for summary judgment addressed only whether Plaintiff's claims must fail because she executed a valid release barring all claims that are the subject of her complaint. The existence or details of the RIF have no bearing on whether the release was valid, and indeed, Plaintiff's one-paragraph objection to the R & R as it pertains to the RIF presents no substantive argument for the objection. (Pl. Obj. at 2.) Plaintiff's assertion that the R & R's "acceptance of the alleged RIF

taints the entire Recommendation & Report" is unsupported by case authority, argument, and the analysis of the R & R. Accordingly, this objection to the R & R is overruled.

### C. Remainder of Recommendations

Portions of the R & R to which a party makes no objection are also reviewed for clear error. *U.S. Flour Corp.*, 2012 WL 728227 at *2. The court therefore reviews for clear error the portions of Judge Scanlon's R & R that were not objected to, including the use and application of the *Bormann* test and analysis of state law claims. The court has reviewed Judge Scanlon's well-reasoned R & R for clear error and finds none. Accordingly, the court also adopts those portions of the R & R.

## IV. CONCLUSION

For the reasons set forth above, Judge Scanlon's R & R is ADOPTED in full. Defendant's motion for summary judgment is GRANTED and Plaintiff's Complaint is DISMISSED. The Clerk of Court is directed to close this case.

SO ORDERED.

### REPORT & RECOMMENDATION

VERA M. SCANLON, United States Magistrate Judge.

Plaintiff Richelle Rivera ("Plaintiff") brings this civil rights action under federal, state and city law based on alleged unlawful discrimination arising out of her employment with Defendant Sovereign Bank ("Defendant"). Pending before the Court is Defendant's motion for summary judgment, which was referred to the undersigned for a report and recommendation. Having reviewed all of the submissions and held oral argument, I find that there are no material issues of fact in

dispute as to the validity of the release executed by Plaintiff that waived all claims against Defendant. I therefore respectfully recommend that the District Court grant Defendant's motion for summary judgment and dismiss Plaintiff's action in its entirety.

## I. Background

In brief, Plaintiff alleges that while she was out on medical leave because of the psychological after-effects of being present during a bank robbery that occurred at her place of employment, Defendant terminated her employment because of her disability status, race and ethnicity. Defendant claims that it implemented a reduction in force ("RIF") that eliminated Plaintiff's position while she was on approved leave. As part of the RIF process, Plaintiff was offered a severance package in exchange for a release. Plaintiff accepted the offer. Defendant brings its motion for summary judgment not on the merits of Plaintiff's claims but solely on the ground that Plaintiff knowingly and voluntarily signed a release of all claims against Defendant in exchange for the severance package such that her claims in this action are barred. Plaintiff claims the release is not valid because she was suffering mental health problems at the time she signed and returned the release to Defendant.

The more detailed facts presented below are drawn from the cited testamentary and documentary evidence.

### a. Plaintiff's Employment With Defendant

Plaintiff graduated from high school and has an Associate's degree in early childhood education. Plaintiff's Deposition ("P. Dep.") [DE 12–2] at 10–11. Plaintiff was employed at Defendant Sovereign Bank from August 2007 to June 2009 as a personal banking representative. D. Stmt. ¶¶ 1–2. Plaintiff's duties included working at a desk to assist bank customers with their banking needs, such as opening and closing bank accounts, transferring funds, and opening credit card accounts. Plaintiff used a computer to perform her job duties. P. Dep. at 14–15.

Plaintiff worked at different bank branches, including two branches in Brooklyn. Id. at 13–14. On October 25, 2008, while Plaintiff was working at one of Defendant's Brooklyn branches, the bank was robbed. Id. at 15–18. Plaintiff continued to work at the bank after the day of the robbery. Id. at 18–19.

### b. Plaintiff's Mental Health Following The Bank Robbery

In or about January 2009, Plaintiff began to have trouble sleeping and to suffer anxiety relating to the bank robbery. P. Dep. at 22–25. She began Family Medical Leave Act leave in mid-January 2009. Id. at 24–25. In mid-January, she began treatment with Dr. Ludmila Davidov, M.D., who diagnosed Plaintiff as suffering from post-traumatic stress disorder relating to the bank robbery and mild postpartum depression. Deposition Transcript of Dr. Davidov, M.D. ("Davidov Dep.") at 21–28.[1] In January 2009, Dr. Davidov determined that Plaintiff could not work because she lacked concentration and could not greet customers. Id. at 31. In early February 2009, Plaintiff also began treatment with a licensed clinical social worker,

---

1. A significant portion of Dr. Davidov's deposition was spent reading her notes about Plaintiff's treatment. The deposition transcript is in the record at DE 12–4. Dr. Davidov's notes are attached to her deposition transcript as DE 12–5 and 12–6. The transcript and the notes are submitted with the Affidavit of Kathryn Russo ("Russo Aff."), Defendant's counsel, which is filed at DE 12–1.

Ms. Wannamaker, who diagnosed Plaintiff as suffering from adjustment disorder with pronounced anxiety. Deposition Transcript of Melissa Wannamaker ("Wannamaker Dep.") [DE 12–7] at 17–24. Even with this diagnosis, Ms. Wannamaker found Plaintiff to be well-oriented to reality. *Id.* at 24.

As outlined in the Davidov deposition and notes, Plaintiff's mental health condition varied in severity between January and May 2009, but it certainly improved in April and May 2009. *See generally* Davidov Dep. Dr. Davidov never diagnosed Plaintiff as psychotic, as having hallucinations or impaired thinking, or of not being oriented to time, place and person. *Id.* at 23, 37–38, 40–41, 44–45, 47–48, 50–52, 58–59, 61, 64, 66 and associated notes [DE 12–5, 12–6]. Over the course of treatment with Dr. Davidov, Plaintiff was prescribed different anti-anxiety medications. Davidov Dep. at 33–40.

Similarly, Ms. Wannamaker observed some fluctuation in Plaintiff's mental state over the course of their sessions, but she also did not believe that Plaintiff was psychotic; she found her to be well-oriented to person, time and place; and she found that her grasp on reality was never impaired. Wannamaker Dep. at 17–27, 38 and associated notes.

In April 2009, Dr. Davidov determined that Plaintiff could return to work but that she could not work in an area open to customers. Russo Aff., Ex. G [DE 12–5] at 11. On or about May 6, 2009, Dr. Davidov forwarded to Defendant a "return to work certificate" on behalf of Plaintiff approving her to return to work. Davidov Dep. at 60–61; Russo Aff., Ex. G [DE 12–5] at 6. Dr. Davidov testified during her deposition that she had read Defendant's description of Plaintiff's duties, and that she understood that Plaintiff's job involved speaking with customers and conducting bank transactions. Davidov Dep. at 32–34, 62, 78–80. Dr. Davidov testified that as of May 6, 2009, Plaintiff was "doing better," well-oriented to reality and not psychotic, and that her judgment was not impaired in any way. *Id.* at 61. Dr. Davidov testified that she felt that Plaintiff "would be capable of doing work in a bank" "on June 1st." *Id.* On the return-to-work certificate, the only restriction Dr. Davidov noted was a request that Plaintiff work "6 hours/day for 1st wk if possible." *Id.* at 60–61; Russo Aff., Ex. G [DE 12–5] at 6. Dr. Davidov testified that in June, Plaintiff's depression was "mild" "because she was able to function," and it did not prevent her from going back to work. Davidov Dep. at 22.

Dr. Davidov testified that Plaintiff had stopped taking her previously prescribed medicine in early June 2009. *Id.* at 63–64 and associated notes [DE 12–5, 12–6]. Dr. Davidov did not think that Plaintiff's judgment was impaired in late June 2009. Davidov Dep. at 66. Soon thereafter, Dr. Davidov reported to Plaintiff's workers' compensation insurance carrier that Plaintiff had "recovered" so that the case was closed. *Id.* at 67–70; DE 12–6 at 9.

Plaintiff knew that Dr. Davidov had sent the certificate and agreed with Dr. Davidov that she was ready to go back to work. P. Dep. at 43. Plaintiff testified that she would have been able to handle her duties on June 1, 2009. *Id.* at 69. During her deposition, Plaintiff confirmed that if she had not been laid off, she would have returned to work on June 1, 2009. *Id.* at 84. She testified that once she was informed she was being laid off, she was not relieved that she did not have to go back to the place of the robbery, but that she "wanted to go back to work." *Id.* at 70. As to her mental state in June 2009, Plaintiff testified during her deposition that she felt better than she had been feeling in January, but she still felt "anxiety and

panic." *Id.* at 53. On or about June 30, 2009, Plaintiff reported to Dr. Davidov that she was feeling good and did not need her medications any more. Davidov Dep. at 63–66.

### c. The Reduction In Force And Plaintiff's Severance Package

In or about November 2008, Defendant decided to reduce its workforce by approximately 2000 positions, starting in late 2008 and continuing through 2009. Affidavit of Paula Baltimore ("Baltimore Aff.") [DE 12–9] ¶ 3. Plaintiff's position was included in this RIF.[2] *Id.* In or about May 2009, Ms. Paula Baltimore, a Human Resources Employee Relations Manager employed by Defendant in Pennsylvania, was asked to telephone all employees who were identified for layoffs in the RIF and who were out on disability leaves; Ms. Baltimore was to advise them of the RIF. *Id.* ¶¶ 2, 4.

On or about May 11, 2009, Ms. Baltimore telephoned Plaintiff and informed her of the RIF. *Id.* ¶ 5. She told Plaintiff that she would receive a copy of her severance package in the mail and that she could call Ms. Baltimore with any questions. *Id.* Ms. Baltimore believed that Plaintiff understood what Ms. Baltimore told her during the call. *Id.* ¶ 6. On May 28, 2009, Defendant sent Plaintiff a letter about the layoff with a severance package and release. *Id.* ¶ 7. The package was delivered to Plaintiff by UPS on June 3, 2009. *Id.* ¶ 8, Ex. K; Russo Aff., Ex. C [DE 12–3].

The severance package offered to laid-off employees such as Plaintiff was two and a half weeks' wages for each completed year of service, with a minimum of four weeks' pay. Plaintiff was offered four weeks' severance pay, which totaled $2,273.60. Baltimore Aff. ¶ 9; Russo Aff., Ex. C. The severance agreement provided that in exchange for the severance benefits, Plaintiff had to return a signed severance agreement with a release within 45 days. Russo Aff., Ex. C ¶ 3. It informed her that if she did not sign and return the agreement within the time period, she would not receive the severance benefits. *Id.* ¶ 3.b. The release provided that in exchange for the benefits, Plaintiff "fully, irrevocably and unconditionally release[d]" all claims against Defendant, including employment-discrimination claims under federal, state and local laws. *Id.* ¶ 5. The agreement included a statement of voluntary assent to the agreement:

> 20. Voluntary Assent. I affirm that no other promises, agreements, representations or warranties of any kind have been made to or with me by the Bank, concerning the terms, enforceability, or implications of this Severance Agreement, other than as are reflected in this Severance Agreement, or to cause me to sign this Severance Agreement, and that I fully understand the meaning and intent of this Severance Agreement. I state and represent that I have had an opportunity to discuss and review the terms of this Severance Agreement with an attorney. I further state and represent that I have carefully read this Severance Agreement, understand the contents herein, freely and voluntarily assent to all of the terms and conditions hereof, and sign my name of my own free act.

*Id.*

During her deposition, Plaintiff confirmed that she received the agreement; she "skimmed through it," and her "main focus was on the money part," as well as on the health insurance. P. Dep. 71–73,

---

**2.** In her 56.1 counterstatement at page 12, Plaintiff denies that Defendant had a reduction in force, but she offers no evidence to the contrary.

75–78. Plaintiff did not read the whole severance package document. *Id.* at 75–76, 79–80 (Plaintiff "skimmed through it, and [she] just read that titles and that was it, nothing—[she] didn't go into detail with anything."). Instead, she just "looked at the math." *Id.* at 78.

During a call, Ms. Baltimore told Plaintiff that "she would not receive the severance pay unless she signed the release." Baltimore Aff. ¶ 11; *see* P. Dep. at 73. Plaintiff only asked Ms. Baltimore whether she could file for unemployment. P. Dep. at 73–74. Plaintiff did not have any other discussions with anyone working with Defendant. *Id.* at 74. She only briefly discussed the waiver and release with her fiancé, and not with anyone else. *Id.* at 74–75. She did not consult with an attorney. *Id.* at 75.

Plaintiff signed the agreement on or about June 4, 2009. P. Dep. at 72. She did so because she felt she had to sign it because she "needed the money." *Id.* at 73, 78–79 (Plaintiff signed the agreement "because she wanted to receive the money"). She returned the signed release to Defendant, which received it on June 10, 2009. Baltimore Aff. ¶ 12.

Plaintiff received her two severance checks in June and July 2009. P. Dep. at 80–81; Russo Aff., Ex. D [DE 12–3] at 16–17. Plaintiff never returned the payments to Defendant. P. Dep. at 81.

In October 2009, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race and disability discrimination. Russo Aff., Ex. H [DE 12–7] at 18–20. Her EEOC charge did not mention the release or any inability to understand it. *Id.* Neither Plaintiff's initial complaint nor the amended complaint refers to the release or any defense to the release.

## II. Discussion

### a. Standard For Summary Judgment

"[S]ummary judgment may be granted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' [Fed.R.Civ.P. 56(a) ]. In determining whether there is a genuine dispute as to a material fact, [the court] must resolve all ambiguities and draw all inferences against the moving party."[3] *Marvel Characters, Inc. v. Kirby,* 726 F.3d 119, 135 (2d Cir.2013) (quoting *Garcia v. Hartford Police Dep't,* 706 F.3d 120, 126–27 (2d Cir.2013) (per curiam) (alteration, some citations, & internal quotation marks omitted)). In ruling on a motion for summary judgment, a district court "may rely on any material that would be admissible at a trial." *Lyons v. Lancer Ins. Co.,* 681 F.3d 50, 57 (2d Cir.2012) (quotation marks omitted); *see Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp.,* 635 F.3d 48, 52 (2d Cir.2011) ("[T]he non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial . . . ." (quotation marks omitted)).

### b. Plaintiff's Claims Were Waived Under A Valid Release

Defendant argues that Plaintiff's claims are barred by her June 2009 release. *See* Defendant's Memorandum of Law [DE 12–10] at 5–16. Plaintiff argues that the release is invalid on the grounds of mental incapacity and/or duress. *See* Plaintiff's Memorandum of Law ("P. Mem.") [DE 20] at 2–8. Defendant has the better argument.

---

**3.** Because the Court determines the summary judgment motion in Defendant's favor, Defendant's motion to dismiss is moot.

Plaintiff has raised claims under federal and New York law. These jurisdictions apply similar but not identical rubrics for evaluating the validity of a waiver of claims. For the sake of completeness, I present the federal and state law arguments with regard to Plaintiff's alleged mental incapacity separately although the discussions are similar.

### 1. Plaintiff's Federal Claims Were Waived Under A Valid Release

■ A party's capacity is presumed, and, to overcome this presumption, the party carries an "extremely heavy" burden of demonstrating that she lacked capacity at the time of the disputed transaction. *See Harrison v. Grobe,* 790 F.Supp. 443, 447 (S.D.N.Y.1992), *aff'd,* 984 F.2d 594 (2d Cir.1993); *Cardona v. Cmty. Access, Inc.,* No. 11–cv–4129 (MB), 2013 WL 304519, at *4 (E.D.N.Y. Jan. 25, 2013). Plaintiff has not offered adequate evidence to overcome this presumption at trial.

### i. A Party Contesting The Validity Of A Waiver Of Claims Bears The Burden Of Proof Under The *Bormann* Factors

■ An employee may waive a federal discrimination or retaliation claim against his or her employer for discrimination if the waiver is knowingly and voluntarily made. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 52, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (waiver of Title VII rights could would have to be "knowing and voluntary" to be valid); *Richardson v. Comm'n on Human Rights & Opportunities,* 532 F.3d 114, 121 (2d Cir.2008) (same); *Bormann v. AT & T Commc'ns, Inc.,* 875 F.2d 399, 402 (2d Cir.1989) (same).[4] In determining whether a waiver was knowing and voluntary, the court must consider the totality of the circumstances surrounding the release. *See Tung v. Texaco Inc.,* 150 F.3d 206, 208 (2d Cir.1998) (finding that under a totality of the circumstances analysis, plaintiff's waiver of his Title VII rights was knowing and voluntary); *Davis v. Eastman Kodak,* No. 04–cv–6098, 2007 WL 952042, at *5 (W.D.N.Y. Mar. 29, 2007) (relying on *Bormann* ); *Hsueh v. Bank of N.Y.,* No. 05–cv–5345 (JSR), 2006 WL 2778858, at *3–*4 (S.D.N.Y. Sep't 26, 2006) (noting that *Bormann* standard applies to waiver of ADA, ADEA, Title VII claims); *Knoll v. Equinox Fitness Clubs,* No. 02–cv–9120, 2003 WL 23018807, at *8 (S.D.N.Y. Dec. 22, 2003) (ADA).

■ Factors that a court usually considers to determine whether a waiver of discrimination claims is knowingly and voluntarily made include the following: (1) the plaintiff's education and business experience; (2) the amount of time that the plaintiff had possession of or access to the agreement before she signed it; (3) the plaintiff's role in deciding the terms of the waiver agreement; (4) the clarity of the agreement; (5) whether the plaintiff was represented by or consulted with an attorney prior to signing the agreement; (6) whether the consideration given to the plaintiff in exchange for the waiver exceeds the employee benefits to which the plaintiff was already entitled by contract or law; (7) whether the employer encouraged or discouraged the plaintiff to consult with an attorney; and (8) whether the plaintiff had a fair opportunity to consult with an attorney prior to signing the agreement. *See Bormann,* 875 F.2d at 403; *see also Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 438 (2d Cir. 1998); *Shain v. Ctr. for Jewish History,*

---

4. The Parties agree that *Bormann* sets forth the "totality of the circumstances" test by which the validity of the release should be evaluated. *See* Letter of Defendant's counsel, dated December 10, 2012. [DE 24]

*Inc.*, No. 04–cv–1762, 2006 WL 3549318, at *4–*5 (S.D.N.Y. Dec. 7, 2006) (waiver of Title VII claim was knowing and voluntary under *Bormann* factors); *Wright v. Eastman Kodak Co.*, 445 F.Supp.2d 314, 317–18 (W.D.N.Y.2006) (same); *Livingston v. Bev–Pak, Inc.*, 112 F.Supp.2d 242, 247–48 (N.D.N.Y.2000). These factors are not exhaustive. A court need not find that all of the factors are satisfied in order to find that the waiver is enforceable. *See Bormann*, 875 F.2d at 403.

### ii. Plaintiff's Claim Of Mental Incapacity And The First *Bormann* Factor

These *Bormann* factors are directed at evaluating whether a person who signed a release of discrimination claims had sufficient knowledge and opportunity to make a reasoned decision about whether he or she would enter into the release and relinquish claims. Underlying the eight-factor test is the assumption that the person has sufficient mental capacity, both cognitively and psychologically, to make such a reasoned decision. Here, Plaintiff alleges that her lack of good mental health at the time she executed the release sufficiently undermines the "knowing and voluntary" quality of her consent such that she was not capable of engaging in a reasoned process in order to determine whether to accept the release agreement. An ability to reason is a necessary pre-condition to being able to understand, interpret and apply the information and advice provided, whether received from Defendant, from Plaintiff's own experience, or from an attorney.

Thus, it is necessary for the Court first to consider Plaintiff's claim of a lack of mental capacity before evaluating the *Bormann* factors. Alternatively, this analysis could be considered an extension of the first *Bormann* factor to the extent that the first *Bormann* factor looks at schooling and work experience as proxies by which to assess a person's mental ability to function in the workplace and to engage in the type of higher cognitive functioning required to evaluate the risks and rewards of agreeing to a severance package with a complete release of claims.

In assessing Plaintiff's claim of lack of capacity to enter into the agreement in June 2009, it is important to note that a plaintiff's own claim of a lack of mental capacity without the support of some objective evidence is not a sufficient basis upon which a court can find that a plaintiff has raised an issue of material fact to justify undoing an agreement.[5] *See McKenna v. Ward*, No. 88–cv–513, 1997 WL 66779, at *6 (S.D.N.Y. Feb. 18, 1997) (refusing to vacate settlement where plaintiff offered no medical testimony or other evidence explaining mental condition and its effect on her ability to seek earlier vacation of settlement); *Reid*, 1997 WL 357969, at *7–*8 (rejecting plaintiff's claims of mental incapacity where plaintiff failed to present evidence sufficient to demonstrate that he had a mental disability when he signed the release agreement or that the disability impaired his ability to act in a reasonable manner). In contrast, where objective evidence of mental inca-

---

**5.** With regard to Plaintiff's mental-incapacity defense to the release, I note that, despite the fact that Plaintiff filed an EEOC charge and complaint, and was permitted to amend her complaint, she only alleged that she lacked the capacity to sign the release in opposition to Defendant's relying on the release. This raises the concern that Plaintiff's defense may simply be a litigation tactic. *See Livingston*,

112 F.Supp.2d at 247–48 (noting that plaintiff failed to raise issue of mental incapacity although he was permitted to amend complaint three times); *Reid v. IBM Corp.*, No. 95cv1755, 1997 WL 357969, at *8 (S.D.N.Y. June 26, 1997) (noting that plaintiff failed to mention his mental condition in his EEOC charge and stating "[t]hat omission is further evidence that such a condition did not exist").

pacity is offered—sometimes, simply by a party's in-court behavior—courts have sometimes held proceedings to assess a party's mental capacity to enter into a release. *See, e.g., Livingston,* 141 F.3d at 438–39 (remanding for proceeding to assess mental capacity of party about whom evidence had been offered that he suffered from schizophrenia); *Massie v. Metro. Museum of Art,* 651 F.Supp.2d 88, 93–94 (S.D.N.Y.2009) (declining to enforce *pro se* plaintiff's oral settlement agreement where court had observed the "erratic and sometimes incoherent nature" of plaintiff's correspondence with the court; plaintiff had made filings in other courts that were "similarly incomprehensible"; and oral agreement had not been reduced to writing).

In this case, Plaintiff states that she suffered from a mental illness and extrapolates that she could not have knowingly and voluntarily entered into the release. Plaintiff does not offer any medical evidence that supports her self-diagnosis as to the scope of her incapacity in June 2009. Plaintiff never explains what about her illness impeded reasonable decision-making. Plaintiff's argument about mental incapacity must fail for at least four reasons.

First, Plaintiff's testimony as described above demonstrates that Plaintiff made a rational decision to enter into the agreement. In May 2009, she learned from Ms. Baltimore of the RIF and that a severance agreement would be forthcoming. She received the severance agreement in early June 2009. She skimmed it, focusing on money and health insurance. She decided to sign it because she needed the money. She discussed it briefly with her fiancé and Ms. Baltimore, but she chose not to speak with anyone else about it. Plaintiff chose not to contact an attorney. Baltimore Aff. ¶¶ 5, 7–8; P. Dep. 71, 76. Although Plaintiff now has regrets, in 2009, she pursued a rational course of action given her financial circumstances and the RIF.

Second, Plaintiff testified that at the time she signed the release, she was prepared and able to return to her position at the bank, which required computer work, interaction with employees and customers, and other focused activities. P. Dep. at 43, 69. Plaintiff concluded her deposition by testifying that if she had not been laid off, she would have returned to her job in early June 2009. *Id.* at 84. As Plaintiff's testimony suggests, she was capable of the high-level functioning required for her job. *Id.* This also suggests that she was able to understand the release.

Third, simply being under treatment for a mental health condition does not equate with an inability to make a knowing and voluntary decision, as implied by Plaintiff's memorandum of law. *See* P. Mem. at 8. Plaintiff's mental health care providers made contemporaneous records of her symptoms, diagnosis and prognosis. *See generally* Davidov and Wannamaker Deps. [DE 12–4 & 12–7]. Plaintiff's diagnosis and symptoms were never reported to have been so disabling that she could not understand what she was doing. *Id.* Even when she was unable to work because of her depression/anxiety, her health care providers' reports all indicated that she was oriented to what was going on around her. *See* Davidov Dep. at 61; Wannamaker Dep. at 24, 27. Even as claimed by Plaintiff, in June 2009, she was suffering primarily from "anxiety, panic," P. Dep. at 60–62, which are not cognitive impairments which necessarily deprive a person of the ability to make a reasonable knowing and voluntary decision. Plaintiff fails to offer any explanation as to how anxiety and depression interfered with her cognitive abilities and good judgment in June 2009 when she signed the release. *See, e.g., McIntosh v. Consol. Ed. Co. of N.Y., Inc.,*

216 F.3d 1072, 1072 (2d Cir.2000) (affirming denial of a Rule 60(b) motion to set aside a settlement agreement based on the district court's conclusions that, *inter alia,* the plaintiff's antidepressant medication did not impair his mental faculties); *Cardona,* 2013 WL 304519, at *5 ("Plaintiffs' assertion that they suffer from anxiety is not enough to demonstrate that they suffered from a condition that was debilitating enough to prevent them from entering into the Settlement Agreement in October 2009.") (collecting cases); *Willgerodt v. Hohri,* 953 F.Supp. 557, 560 (S.D.N.Y. 1997) ("There is no evidence, however, that [the contracting party]'s depression caused her to lack contractual capacity, or that her agreement was the result of impulsive or irrational behavior beyond her control.").

Fourth, Dr. Davidov approved of her anticipated return to work in full knowledge of the demands of Plaintiff's position. Although in February 2009, her cognition was evaluated by Dr. Davidov as "decreased concentration," by May 2009, her cognition was described as "fair." Davidov Dep. at 74. Her decreased concentration had alleviated by June 2009 when she was supposed to return to work. *See id.* at 22, 32–34, 60–61. The only limitation on her work suggested by her doctor for June 2009 was one week of a reduced schedule of six hours a day. Davidov Dep. at 60–61; Russo Aff., Ex. G. Thus, the medical evidence found in Dr. Davidov's and Ms. Wannamaker's testimonies and notes suggests only that Plaintiff was capable of working the same job she had prior to her FMLA leave. By extension, she was capable of reading and understanding the severance agreement which was similar to some of the duties she performed in her job.

Based on this record, Plaintiff has not raised an issue of material fact as to her capacity to have knowingly and voluntarily entered into a release to waive her claims against Defendant.

### iii. The Balance of The *Bormann* Factors Shows Plaintiff Entered Into The Release Knowingly And Voluntarily

█ I therefore now turn to the *Bormann* factors by which such releases are evaluated when there is no allegation of mental illness-related impairment. Here, a review of the *Bormann* factors shows that Plaintiff knowingly and voluntarily entered into the severance agreement. As to the first factor, Plaintiff has a college degree and had worked in customer service for about two years when she signed the release. P. Dep. at 11–15. In her position at the bank, Plaintiff worked with contracts for bank and credit cards, and was thus familiar with the assessment of risks and benefits required before entering into an agreement. As to the second factor, she knew of the agreement from May 11, 2009, then received it on June 3, 2009. Baltimore Aff. ¶¶ 5, 8. She signed it the next day, although the document said that she had 45 days to sign and return it to Defendant. Russo Aff., Ex. C; *see Johnston v. Carnegie Corp. of N.Y.,* 2011 WL 1118662, at *3 (S.D.N.Y. Mar. 23, 2011) (adopting report and recommendation finding 21 days to consider an agreement was supportive of the contract's validity under the second *Bormann* factor); *Lambertson v. Kerry Ingredients, Inc.,* 50 F.Supp.2d 163, 169 (E.D.N.Y.1999) (holding that 24 hours is sufficient time for a plaintiff to review release). Plaintiff's rapid turnaround of the severance agreement once she had received it in the mail is therefore not as rapid as it initially seems because Plaintiff had about a month's notice of the RIF and the agreement prior to receipt of the agreement. This time gave Plaintiff time to consider her options; discuss her prospects with family, friends or an attor-

ney; and ask questions of Ms. Baltimore. As to the fourth factor, the agreement, although long, is extremely clear. Russo Aff., Ex. C. It includes several lines about the release, and it includes the voluntary-assent paragraph quoted above. *Id.* ¶¶ 5–6, 20.

As to the sixth factor, the signed agreement states that the consideration to be given to Plaintiff in exchange for the waiver exceeds the employee benefits to which she was already entitled by virtue of her employment. *Id.* ¶ 5 ("In consideration of my receipt of the Conditional Severance Benefits, which I acknowledge I would not otherwise be entitled to receive, . . ."). Of course, Defendant could have terminated Plaintiff's employment without offering her any severance so she received a clear benefit by entering into the severance agreement and receiving more than $2000.

This sixth factor encourages the court to look at the economic reality of the severance agreement to help assess whether a reasonable person might have entered into the agreement. Thus, the Court asks: Was Plaintiff somewhat better off with the release than she would have been without the release, given the sacrifice of her right to bring suit against Defendant? Here, Plaintiff received more than $2000 in pretax earnings without having to go to work in exchange for her release. Plaintiff now argues that she was not better off, saying that she signed the agreement because she needed the money. Her attorney claims that Plaintiff was placed under "duress and pressure" by Ms. Baltimore. P. Mem. at 6. Plaintiff's personal economic position cannot be converted into a claim of duress. Economic duress exists when a party is

compelled to agree to the terms of a release by means of a wrongful threat that prevents the exercise of free will and where the party accepted such terms because the circumstances permitted no alternative. *See Kamerman v. Steinberg,* 891 F.2d 424, 431 (2d Cir.1989); *Reid,* 1997 WL 357969, at *7 (internal quotation marks omitted); *Joseph v. Chase Manhattan Bank, N.A.,* 751 F.Supp. 31, 35 (E.D.N.Y.1990). "[S]elf-imposed, undisclosed, and subjective fears do not constitute an act of duress by the defendant cognizable in law." *Joseph F. Egan, Inc. v. City of N.Y.,* 17 N.Y.2d 90, 98, 268 N.Y.S.2d 301, 215 N.E.2d 490 (1966). The fact that an employee has an alternative, such as a pursuit of a discrimination claim in a court of law, "rules out a claim of duress which necessarily depends on the absence of choice." *Joseph,* 751 F.Supp. at 35. In light of the record, Plaintiff has not raised an issue of material fact in dispute with regard to any alleged duress. Accordingly, the sixth factor tips in Defendant's favor.

Three of the *Bormann* factors relate to the possibility that Plaintiff could have obtained legal advice about her severance agreement before she signed it and accepted the severance payments.[6] As to the fifth factor, although Plaintiff did not have an attorney when she signed the agreement, it was her decision not to consult one, as the agreement suggested that she do so. As to the seventh factor, Plaintiff now claims that she was not advised by Defendant to consult an attorney, Pl. Aff. ¶ 20 (a claim reiterated in her memorandum of law at 5); however, this is contrary to the specific terms of the written agreement, Russo Aff., Ex. C. ¶ 20. As to the

---

**6.** Given the relatively small amount of money paid in the release and the hourly rate of many attorneys in the New York area, it would probably have been economically impractical for Plaintiff to pay an attorney to review the agreement and release without paying at least several hundred dollars, which would have depleted a significant portion of her severance payment.

eighth factor, in the agreement itself, Plaintiff represented and affirmed that she had had an opportunity to discuss and review the terms of the agreement with an attorney. *Id.* ¶ 20.

Only one *Bormann* factor weighs somewhat in Plaintiff's favor, the third factor, which was whether Plaintiff had input into the terms of the agreement. That factor carries little if any weight in light of the RIF. In a RIF affecting approximately 2000 employees, it was not necessary for Defendant to modify the release to suit each person's situation, although it should be noted that Defendant did calibrate the amount of each employee's severance payment to the departing employee's years of service. Had Defendant had more individualized agreements, it would have introduced the possibility of unfairness as between employees in the RIF process. Rather, the standardized agreement helped avoid inconsistent treatment among the employees covered by the RIF.[7]

### iv. Plaintiff Fails To Offer Sufficient Evidence To Raise An Issue Of Material Fact As To The Validity Of The Release

Based on the record before the Court, Plaintiff has not raised a disputed issue of material fact to show that her actions were not voluntary and knowing, or that she lacked the competency to enter into the agreement. Her federal claims are thus barred by the severance agreement release.

### 2. Plaintiff's New York Claims Were Waived Under A Valid Release

Plaintiff also raised claims under New York State and City law.[8] Although some of those antidiscrimination statutes provide greater protections than those that are available under federal law, *see, e.g., St. Jean v. United Parcel Serv. Gen. Serv. Co.*, 509 Fed.Appx. 90, 91 (2d Cir.2013), the release executed by Plaintiff also bars claims under these laws, *see Shain*, 2006 WL 3549318, at *3 (describing the New York test for the enforcement of a release as "less stringent" than the federal test); *see also DuFort v. Aetna Life Ins. Co.*, 818 F.Supp. 578, 583 (S.D.N.Y.1993). As to the state and city claims, under New York law, a "release is a contract whose interpretation is governed by principles of contract law." *Goode v. Drew Bldg. Supply*, 266 A.D.2d 925, 925, 697 N.Y.S.2d 417, 417 (4th Dep't 1999) (*quoting Metz v. Metz*, 175 A.D.2d 938, 939–40, 572 N.Y.S.2d 813, 815 (3d Dep't 1991)). "Where the language of the release is clear, effect must be given to the intent of the parties as indicated by the language employed." *Metz*, 175 A.D.2d at 939–40, 572 N.Y.S.2d 813; *see Cramer v. Newburgh Molded Prods.*, 228 A.D.2d 541, 541–42, 645 N.Y.S.2d 46, 46 (2d Dep't 1996) (dismissing claims of age discrimination arising out of termination of employment because plaintiff had waived employment discrimination claims in release). Here, the language of the agreement indicates that, in consider-

---

7. That being said, the Court notes that although a tailored severance agreement would not have been practical for most of the approximately 2000 employees who lost their jobs in the RIF, and one was not required of Defendant as to Plaintiff, perhaps a severance package adapted for Plaintiff would not have been unjustified for someone as uniquely situated as Plaintiff, an employee who had endured a job-related trauma immediately before the RIF was planned.

8. Although the release states that it is governed by Pennsylvania Law, Russo Aff., Ex. C ¶ 20, the Parties' memoranda of law apply New York law, so this report and recommendation relies on New York law as the law of the state in which the alleged events occurred.

ation for the compensation and benefits provided, Plaintiff intentionally gave up and released all claims and disputes that she had or might have had with Defendant without limitation. Russo Aff., Ex. C ¶ 5; *see Gant v. Brooklyn Dev. Ctr.*, 307 A.D.2d 307, 308, 762 N.Y.S.2d 507, 507 (2d Dep't 2003); *Cramer*, 228 A.D.2d at 541–42, 645 N.Y.S.2d 46; *Stone v. Nat'l Bank & Trust Co.*, 188 A.D.2d 865, 867–68, 591 N.Y.S.2d 609, 611 (3d Dep't 1992). In fact, the agreement specifically released the kind of claims raised in Plaintiff's EEOC charge and this suit, and Plaintiff warranted in the Agreement that she would not initiate a lawsuit based thereon. Russo Aff., Ex. C ¶¶ 5–6. Thus, unless Plaintiff can demonstrate that she did not knowingly and voluntarily execute the Agreement, she is bound by the terms and precluded from bringing her state and city claims to court. *See, e.g., 400 West 59th St. Partners, LLC v. Edwards*, 28 Misc.3d 93, 94, 907 N.Y.S.2d 765, 767 (N.Y.Sup.App.Term 2010) (a plaintiff bears the burden of proving he or she lacked the mental capacity to enter into a release in order to be relieved of obligations).

As to Plaintiff's primary defense of mental incapacity, I look at it in light of New York's schema for considering whether a release is valid in light of such a claim. ▮ Under New York law, "[a] release will not be treated lightly, and will be set aside by a court only for duress, illegality, fraud, or mutual mistake." *Shklovskiy v. Khan*, 273 A.D.2d 371, 372, 709 N.Y.S.2d 208, 209 (2d Dep't 2000) (citations omitted). "A natural person who manifests assent to a transaction has full legal capacity to incur contractual duties thereby unless he is ... (c) mentally ill or defective, or (d)

intoxicated." Restatement (Second) of Contracts § 12(2) (cited in *Reid*, 1997 WL 357969, at *6–*9 (granting employer's motion for summary judgment because plaintiff had signed release of claims)). In order to avoid the enforcement of a release of New York law claims based on mental incapacity, a plaintiff must show that she was so affected by her mental condition as to be incapable of comprehending the nature of a settlement agreement and the surrounding proceedings, of making a rational decision concerning entering into the agreement, or of controlling her conduct. *See Scarfone v. Vill. of Ossining*, 23 A.D.3d 540, 541, 806 N.Y.S.2d 604, 605 (2d Dep't 2005); *Reid*, 1997 WL 357969, at *7; *Matter of Verdugo v. Peachtree Funding Northeast*, 500137/09, NYLJ 1202608540669, 41 Misc.3d 1221(A), 2013 WL 5809636 (N.Y.Sup.Ct., N.Y. County, May 29, 2013; published June 28, 2013); *see also DuFort*, 818 F.Supp. at 583 (citing *Ortelere v. Teachers' Ret. Bd. of the City of N.Y.*, 25 N.Y.2d 196, 303 N.Y.S.2d 362, 250 N.E.2d 460 (1969)). New York courts have refused to find that general allegations of mental illness that are not specifically tied to a lack of comprehension or rational decisionmaking are sufficient to support the undoing of an otherwise valid release. *See, e.g., Sears v. First Pioneer Farm Credit, ACA*, 46 A.D.3d 1282, 1285, 850 N.Y.S.2d 219, 222 (3d Dep't 2007); *Willgerodt*, 953 F.Supp. at 560. Simply suffering from a mental illness is not enough to relieve a person from obligations undertaken in a contract; rather, the illness must interfere with a person's ability to understand the contract or act in his or her best interest.[9] *See Blatt v.*

---

**9.** *See, e.g., In re Estate of Menahem*, 16 Misc.3d 1125(A), 847 N.Y.S.2d 903 (N.Y.Sur. 2007):

While bipolar disorder is a serious mental illness which may in certain circumstances render a person incapable of forming the mental capacity to enter into contracts and

*Manhattan Med. Grp., P.C.,* 131 A.D.2d 48, 51, 519 N.Y.S.2d 973, 975 (1st Dep't 1987) ("[I]f mere depression, serious or otherwise, can be considered a valid reason to avoid a contract . . . then the courts will be confronted with a plethora of claims by litigants declaring that they were too depressed or unhappy to know what they were doing and should, thus, be relieved, from the effects of their conduct.").

■ Although Defendant argues that New York cases require a party seeking to avoid a contract based on mental illness to prove that he or she was psychotic at the time of signing, New York courts have not been so demanding. *See, e.g., Faber v. Sweet Style Mfg. Co.,* 40 Misc.2d 212, 215–16, 242 N.Y.S.2d 763, 767 (N.Y.Sup.1963) ("The law does, however, recognize stages of incompetence other than total lack of understanding. Thus it will invalidate a transaction when a contracting party is suffering from delusions if there is 'some such connection between the insane delusions and the making of the deed as will compel the inference that the insanity induced the grantor to perform an act the purport and effect of which he could not understand, and which he would not have performed if thoroughly sane, . . .' " (citations omitted)). Rather, New York courts allow that even if a plaintiff can understand the nature of his or her actions, a contract signed by a mentally ill person might be voided if competence was lost

through an illness or disorder that affected "motivation or exercise of will." *Sparrow v. Demonico,* 461 Mass. 322, 960 N.E.2d 296, 302–03 (2012) (discussing development of law of contracts and mental competency, including considering New York cases such as *Ortelere,* 303 N.Y.S.2d at 369–70, 250 N.E.2d 460, in which a plaintiff suffering from psychosis was not bound by release); *see Fingerhut v. Kralyn Enters., Inc.,* 71 Misc.2d 846, 850, 337 N.Y.S.2d 394, 399 (N.Y.Sup.1971) (tracing evolution of New York's law on mental capacity and ability to contract). "Under this modern, affective test, '[w]here a person has some understanding of a particular transaction which is affected by mental illness or defect, the controlling consideration is whether the transaction in its result is one which a reasonably competent person might have made.' " *Id.,* 461 Mass. at 330, 960 N.E.2d at 303 (citation omitted) (evidence showed that the plaintiff generally knew she participated in a mediation, its purpose and its goal, and was able to comment on its progress and was aware of the consequences of the agreement, but not that the agreement was unreasonable or that a reasonably competent person would not have entered into it).

In *Sparrow,* the court observed that other jurisdictions had not clearly stated what evidence was needed to establish incapacity under this test. The *Sparrow* Court required that "medical evidence is neces-

---

agreements, there is no authority to conclude that all persons who are diagnosed as being bipolar lack mental capacity to enter into contracts. Thus, this court is loathe to conclude as a matter of law that all persons suffering from this disorder lack the mental capacity to enter into agreements or conduct their business in their own best interests. Moreover, in light of the evidence that if treated, a person suffering from this disorder may lead a normal life, the court is equally loathe to make such an assumption or assertion. The court is also mindful that

a person suffering from this disorder may lack the mental capacity to enter into contracts or even negotiate in their own best interests, because of their inability to think rationally. Thus, it is necessary for the court to assess the evidence presented in each case. In the instant case, based on the credible evidence it is the determination of the court that [the party] has failed to sustain her burden of proof that she lacked mental capacity to enter into the prenuptial agreement.

sary to establish that a person lacked the capacity to contract due to the existence of a mental condition." *Id.* at 332, 304, 960 N.E.2d 296. It is possible that New York would follow this general rule because in cases regarding mental competence, New York courts have looked for some objective source of evidence as to the effect of the alleged mental illness, offered either by professional observation or by a disinterested witness. *See, e.g., 400 West 59th St. Partners,* 28 Misc.3d at 94, 907 N.Y.S.2d at 767; *DuFort,* 818 F.Supp. at 580; *K.A.L. v. R.P.,* 35 Misc.3d 1211(A), 950 N.Y.S.2d 723 (N.Y.Sup.2012). Whether New York law would require supporting medical evidence or whether objective nonmedical evidence would suffice, I need not decide in this case because Plaintiff has failed to present any medical evidence or evidence from a disinterested source that when she entered the release, she had a mental disability that impaired her ability to act in a reasonable manner. Moreover, she has failed to show that the transaction of accepting more than $2000 in severance payments when a RIF had brought about the loss of her position was a decision a reasonably competent person would not have made. Plaintiff thus fails to raise issues of material fact to show that she could satisfy New York's test regarding mental incapacity to contract for the release of any possible claims against her former employer.

Given Plaintiff's failure to show a lack of mental capacity, under New York law, courts assess the knowing and voluntary quality of her agreement. As discussed above in connection with the federal claims, particularly under the *Bormann* factors, Plaintiff failed to raise an issue of fact as to her ability to understand the release and knowingly enter into the agreement with Defendant.

Accordingly, Plaintiff's state and city law claims are barred by the release.

### c. Ratification And Repudiation Doctrines May Bar Plaintiff's Claims

Defendant argues that the release is valid because Plaintiff never returned the consideration or two severance payments that she received from Defendant for signing and returning the agreement, and waiving her claims against Defendant. *See* D. Reply Mem. [DE 21] at 5.

Several courts have applied the ratification or repudiation doctrine in Title VII and similar statutory civil rights cases. *See Reid,* 1997 WL 357969, at *16; *Davis,* 2007 WL 952042, at *7 (collecting cases). By failing to return the severance funds received, the plaintiff is deemed to have ratified the agreement, even if the entry into the agreement was flawed, such as having been made under duress or fraud. *See Cavelli v. N.Y.C. Dist. Council of Carpenters,* 816 F.Supp.2d 153, 164–65 (E.D.N.Y.2011) (plaintiffs waived their rights to challenge releases when they did not repudiate the consideration). It is well established that where money paid as consideration for a release acquired by fraud, duress or other limitation is retained after the releaser becomes aware of the fraud, or the duress or limitation is removed, ratification may be found. Upon learning that a contract is voidable, the releasing party must "promptly repudiate the contract or release [or] [s]he will be deemed to have ratified it." *VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 122–23 (2d Cir.2001). Courts have found ratification where a releasing party waited as little as six months to repudiate the release. *See, e.g., id.* at 123; *Bank Leumi Trust Co. of N.Y. v. D'Evori Int'l Inc.,* 163 A.D.2d 26, 30, 558 N.Y.S.2d 909, 914 (1st Dep't 1990). A party may ratify a release, *inter alia,* "by intentionally accepting benefits under the contract." *See VKK Corp.,* 244 F.3d at 123 (internal quotation marks omitted);

*David v. Am. Tel. & Tel.*, 160 A.D.2d 632, 632, 559 N.Y.S.2d 505, 506 (1st Dep't 1990) ("A contract allegedly executed under duress is voidable, not void, and a plaintiff must demonstrate his decision to challenge that contract rather than to ratify it by accepting its benefits, even where he faces the hard choice of eschewing those benefits in order to pursue his legal rights . . . ." (citation omitted)); *see also Kovian v. Fulton Co.*, 857 F.Supp. 1032, 1039 (N.D.N.Y.1994) (such conduct "signifie[s]" intent to ratify).

Under such circumstances, filing an EEOC charge does not prevent ratification. *See, e.g., Knoll v. Equinox Fitness Clubs*, No. 02–cv–9120, 2003 WL 23018807, at *8 (S.D.N.Y. Dec. 22, 2003) (filing an EEOC charge does not "show an intent to repudiate the Release . . . [it] has nothing to do with [the plaintiff's] decision to continue to accept the benefits conferred by the [r]elease"); *Frumkin v. IBM Corp.*, 801 F.Supp. 1029, 1044 (S.D.N.Y.1992) ("reject[ing] Plaintiff's assertion that the filing of the EEOC complaint suffices to establish a valid repudiation of the release agreement," where he retained the consideration).

Although New York does not apply the "tender back" doctrine, *see* N.Y. CPLR Sec. 3004, New York does recognize the defense of ratification by acceptance and retention of consideration. *See Allen v. Riese Org., Inc.*, 106 A.D.3d 514, 518, 965 N.Y.S.2d 437, 440 (1st Dep't 2013) (finding ratification of releases of employment claims) (collecting cases); *Nicomedez v. AIG*, No. 12cv490 (KBF), 2012 WL 5264560, at *3–*4 (S.D.N.Y. Oct. 16, 2012) (citing cases) (ratification precluded state and city human rights law claims); *Cavelli*, 816 F.Supp.2d at 164–66; *Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 630 F.Supp. 1298, 1303 (S.D.N.Y.1986) ("The defense of ratification focuses on a party's acquiescence in or acceptance of the contract after discovering the basis of his claim for rescission, not on the party's willingness to restore benefits once the action is brought. Thus, the statutory modification rendered by N.Y.C.P.L.R. § 3004 does not eliminate the defense of ratification by acceptance."); *Continental Ins. Co. v. Helmsley Enters., Inc.*, 211 A.D.2d 589, 589, 622 N.Y.S.2d 20, 20 (1st Dep't 1995) (affirming that plaintiff waived its right to seek rescission of the contract of insurance when it knowingly accepted premium payments for several months following discovery of the alleged misrepresentations upon which it claimed to have relied when it issued the policies); *but see Skipworth v. Cooper*, 37 A.D.2d 906, 907, 325 N.Y.S.2d 485, 485 (4th Dep't 1971) (defendant's rights to credit for payment of consideration are protected by judgment, but repayment of consideration need not be made prior to judgment).

█ Ratification is an act by which an otherwise voidable agreement is made valid. *See Clark v. Buffalo Wire Works Co.*, 3 F.Supp.2d 366, 372 n. 5 (W.D.N.Y.1998) (citations omitted). If the contract is void because of a party's incapacity at its inception, the agreement cannot be enforced because there was no meeting of the minds. *Id.* (citations omitted). In this case, if the release was void because of Plaintiff's alleged mental incapacity, the doctrines of ratification and repudiation do not help Defendant because the void contract cannot be ratified. If the contract was voidable because it was not made knowingly and voluntarily, but not because of a mental incapacity, then Plaintiff has ratified the release by failing to return the consideration she received. Thus, resolution of the ratification question depends on the above determination of Plaintiff's mental capacity to enter into the release in 2009.

## III. Conclusion

For the reasons stated above, I respectfully recommend that Defendant's motion for summary judgment be granted because the release is valid and bars Plaintiff's claims, and that Plaintiff's complaint be dismissed in its entirety. I respectfully recommend that Defendant's motion to dismiss be denied as moot.

A copy of this Report and Recommendation will be posted on the Court's ECF filing system as of the date noted below. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen days of service of this Report. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 72(b). Failure to file objections within fourteen days will preclude further review of this report and recommendation either by the District Court or the Court of Appeals. *See Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir.2008) (stating that "failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"). A courtesy copy of any objections should be sent to the District Judge. Any request for additional time to object must be directed to the District Judge.

**SO ORDERED.**

Dated: August 30, 2013